# EXHIBIT A

## to

# Declaration of Craig H. Bennion

1

**THE HON. JOHN C. COUGHENOUR**

2

3

4

5

6

7

8          UNITED STATES DISTRICT COURT
        WESTERN DISTRICT OF WASHINGTON
9                   AT SEATTLE

10   PREMIER HARVEST LLC, a Washington
     Limited Liability Company; PREMIER
11   HARVEST LLC, a Alaska Limited Liability        No.: 17-cv-00784-JCC
     Company; PREMIER HARVEST ADAK LLC,
12   an Alaska Limited Liability Company,
                                                     AXIS SURPLUS INSURANCE
13                 Plaintiffs,                       COMPANY'S FIRST SET OF
                                                     REQUEST FOR PRODUCTION OF
14          v.                                       DOCUMENTS TO PLAINTIFFS

15   AXIS SURPLUS INSURANCE COMPANY, a
     Foreign Corporation; CUNNINGHAM
16   LINDSEY U.S., INC., a Foreign Corporation,

17                 Defendants.

18

19   PROPOUNDING PARTY:     AXIS SURPLUS INSURANCE COMPANY

20   RESPONDING PARTY:      PREMIER HARVEST LLC, a Washington Limited Liability
                            Company; PREMIER HARVEST LLC, a Alaska Limited
21                          Liability Company; PREMIER HARVEST ADAK LLC, an
                            Alaska Limited Liability Company
22   SET:                   One

23          TO PLAINTIFF PREMIER HARVEST LLC AND/OR PREMIER HARVEST ADAK

24   LLC AND ITS ATTORNEYS OF RECORD:

25          Pursuant to Rules 26 and 34 of the Federal Rules of Civil Procedure, Defendant Axis

26   Surplus Insurance Company ("AXIS"), by and through its undersigned counsel, hereby

AXIS'S FIRST SET OF REQUEST FOR PRODUCTION OF
DOCUMENTS TO PLAINTIFFS - 1

LAW OFFICES OF
**COZEN O'CONNOR**
A PROFESSIONAL CORPORATION
999 THIRD AVENUE
SUITE 1900
SEATTLE, WASHINGTON 98104
(206) 340-1000

requests that Plaintiffs Premier Harvest LLC, a Washington Limited Liability Company; Premier Harvest LLC, a Alaska Limited Liability Company; and Premier Harvest Adak LLC, an Alaska Limited Liability Company (collectively "Premier Harvest"), produce for inspection the following documents, electronically stored information, and things, at the offices of Cozen O'Connor, 999 Third Avenue, Suite 1900, Seattle, Washington 98104, within the period prescribed by the Rules.

## DEFINITIONS AND INSTRUCTIONS

The following terms shall have the meaning set forth below:

1.      "Complaint" refers to Premier Harvest LLC's First Amended Complaint for Breach of Contract and Bad Faith, Washington State Superior Court for King County Case No. 17-2-10618, removed to United States District Court for the Western District of Washington, Case No. 2:17-cv-00784.

2.      The term "document" or "documents" means any and all writings, tangible things and property, of any kind, that are now or that have been in your actual or constructive possession, custody or control, whether stored electronically or in physical form, including, but not limited to, any handwritten, typewritten, printed, drawn, charted, copied, recorded, transcribed, electronically generated, graphic, videographic or photographic matter of any kind or nature. The term document or documents also means every copy of a document, where such copy is not an identical duplicate of the original, whether because of deletions, underlining, showing of blind copies, initialing, signatures, receipt stamps, comments, notations, or any other difference or modification of any kind.

3.      The "storms" refers to the weather events of December 2015 and January 2016 described in Paragraph 4.1 of the complaint, including the alleged "freeze event."

4.      The "claim" means Premier Harvest's insurance claim(s) submitted to AXIS for losses that Premier Harvest claims to have suffered resulting from the storms.

AXIS'S FIRST SET OF REQUEST FOR PRODUCTION OF
DOCUMENTS TO PLAINTIFFS - 2

LAW OFFICES OF
**COZEN O'CONNOR**
A PROFESSIONAL CORPORATION
999 THIRD AVENUE
SUITE 1900
SEATTLE, WASHINGTON 98104
(206) 340-1000

LEGAL\33057557\1

5.      The "Property" means all property in Adak, AK leased by Premier Harvest from Aleut Fisheries, LLC.

6.      "AXIS," "us," or "our" refer to Axis Surplus Insurance Company, its employees, agents, attorneys, and any person acting on its behalf.

7.      "You," "your," or "Premier Harvest" refer to Premier Harvest LLC; Premier Harvest Adak, LLC; Premier Harvest Alaska LLC; AK Premier Harvest Adak LLC; and/or AK Premier Harvest LLC and their past and present parents, predecessors, successors, subsidiaries, affiliates, members, managers, officers, employees, agents, attorneys, and all other persons acting or purporting to act on their behalf.

8.      "Cunningham Lindsey" refers to Defendant Cunningham Lindsey U.S., Inc., its employees, agents, attorneys, and any person acting on its behalf.

9.      "Person" means a natural person and all entities or organizations of any type, kind, or nature such as a corporation, partnership or governmental agency.

10.      The term "Policy" refers to AXIS policy number EAF786108-15 issued to Premier Harvest, with policy period March 3, 2015 to March 3, 2016.

11.      "Relating to" means pertinent, relevant or material to, evidencing, having a bearing on, or concerning, affecting, discussing, dealing with, considering or otherwise relating in any manner whatsoever to the subject matter of the inquiry.

12.      The singular includes the plural and vice versa.  The words "and" and "or" shall be both conjunctive and disjunctive and shall be construed broadly and inclusively.

13.      The word "all" means "any and all."  The word "any" means "any and all."  The word "including" means "including, without limitation, …".

14.      If any information called for by any requests for production is withheld because you contend that such information is privileged:  (1) identify the subject matter of the purportedly privileged information; (2) identify the privilege asserted; (3) state all facts which

AXIS'S FIRST SET OF REQUEST FOR PRODUCTION OF
DOCUMENTS TO PLAINTIFFS - 3

LAW OFFICES OF
COZEN O'CONNOR
A PROFESSIONAL CORPORATION
999 THIRD AVENUE
SUITE 1900
SEATTLE, WASHINGTON 98104
(206) 340-1000

LEGAL\33057557\1

form the basis for your assertion of privilege; and (4) state the paragraph and number of the requests for production to which the information is responsive.

15.     These requests for production are continuing in nature, and you are obligated to change, supplement, and correct your answers to conform all available information, including, without limitation, such information as first becomes available to you after your answers hereto are served.

## **GENERAL PROCEDURES**

1.     These discovery requests have been served upon you.  This discovery is to be answered under oath within thirty (30) days of the date of service in the manner provided by the Federal Rules of Civil Procedure.  These discovery requests are continuing, and in the event you discover further information or documentation which alters, modifies, deletes, or augments the answers given now or any time hereafter, you are to provide such information by supplemental answers and/or production of such documents.

2.     If you claim that an answer, either in whole or in part, to any discovery request or portion thereof, is subject to any privilege or is otherwise objectionable or protected from discovery, you are to identify the subject matter, the answer to which such privilege, objection or protection is thought to apply, and state the ground or basis for each such claim, objection, privilege or protection.  All portions of such a discovery request not regarded as calling for a protected or objectionable response are to be answered fully.

3.     By these discovery requests, you are asked to produce for inspection and copying each and every one of the documents and other tangible things identified below by item or category which you have in your possession or custody or under your control.

## **INSTRUCTIONS**

1.     In the event that any document requested herein has been destroyed, altered, lost, discarded, or otherwise disposed of, you must provide AXIS Surplus with a written statement:  (1) describing in detail the nature and contents of each such document; (2)

AXIS'S FIRST SET OF REQUEST FOR PRODUCTION OF
DOCUMENTS TO PLAINTIFFS - 4

LAW OFFICES OF
**COZEN O'CONNOR**
A PROFESSIONAL CORPORATION
999 THIRD AVENUE
SUITE 1900
SEATTLE, WASHINGTON 98104
(206) 340-1000

LEGAL\33057557\1

identifying the author(s), recipient(s), and sender(s) of each such document; (3) specifying the date each such document was prepared or transmitted; and (4) specifying the date on which each such document was lost or disposed of, and, if disposed of, the conditions of and reason for such disposal, the person(S) authorizing such disposal, the person disposing of the document, and any person(S) currently in possession of any copies of the document.

2.    To the extent any requests involve the identification of documents, all responsive documents, wherever located, in the possession, custody, or control of Premier Harvest, including any documents contained in the personal files or devices of past or present employees of Premier Harvest, shall be included.  Copies of documents that are not identical duplicates of the original documents because of markings, handwritten notations, or other differences shall be produced as separate documents.

3.    If you withhold, in whole or in part, any document requested herein on assertion of privilege, work product, or otherwise, you must identify the specific grounds upon which the objection is based and the particular request(s) objected to, and identify any withheld document or portion(s) thereof as follows:

(1)    its date;

(2)    the identity of its authors and signatories;

(3)    describe the type of document;

(4)    the subject of the document;

(5)    its present location and custodian;

(6)    list all personS, including, without limitation, e-mail addresses (including "CCs" and "BCCs") to whom the contents of the document have been disclosed, including the date and means of such disclosure; and

(7)    the nature of the privilege or other legal doctrine relied upon and all facts supporting your assertion thereof.

AXIS'S FIRST SET OF REQUEST FOR PRODUCTION OF
DOCUMENTS TO PLAINTIFFS - 5

LAW OFFICES OF
**COZEN O'CONNOR**
A PROFESSIONAL CORPORATION
999 THIRD AVENUE
SUITE 1900
SEATTLE, WASHINGTON 98104
(206) 340-1000

LEGAL\33057557\1

4.      In the event you object to any of the requests herein on the grounds that the request is overbroad for any reason, please respond to that request as narrowed in a way that renders it not overbroad in your opinion, and state the extent to which you have narrowed that request for purposes of its response.

5.      These requests require the production of original documents in the same form and in the same order as they are kept in the ordinary course of business.

6.      Unless otherwise stated, the period of time applicable to these requests is January 1, 2014 to the present.

7.      Pursuant to F.R.C.P. 26(e), Premier Harvest has an ongoing duty to supplement or amend its responses to these requests, including, without limitation, producing any responsive documents discovered or created after Premier Harvest first responds to these requests.

## REQUESTS FOR PRODUCTION OF DOCUMENTS

## REQUEST FOR PRODUCTION OF DOCUMENTS NO. 1:

Produce all documents relating to the formation and governing of the Premier Harvest entities and any other business association you claim qualifies as an insured under the Policy, including operating agreements, limited liability company agreements, certificates of formation, annual reports, articles of conversion or merger, certificate of dissolution, certificate of revocation of dissolution, and lists of member(s) and/or manager(s).

**RESPONSE:**

## REQUEST FOR PRODUCTION OF DOCUMENTS NO. 2:

Produce all accounting records, cash and/or asset statements, financial statements, profit and loss statements, and federal, state and/or local tax returns relating to the Premier Harvest entities beginning in 2012 through the present.

AXIS'S FIRST SET OF REQUEST FOR PRODUCTION OF
DOCUMENTS TO PLAINTIFFS - 6

LAW OFFICES OF
**COZEN O'CONNOR**
A PROFESSIONAL CORPORATION
999 THIRD AVENUE
SUITE 1900
SEATTLE, WASHINGTON 98104
(206) 340-1000

LEGAL\33057557\1

1    **RESPONSE:**

2

3    **REQUEST FOR PRODUCTION OF DOCUMENTS NO. 3:**

4        Produce all documents relating to the assignment of the lease of the Property to Premier

5    Harvest, including any documents relating to the condition of the Property.

6        **RESPONSE:**

7

8    **REQUEST FOR PRODUCTION OF DOCUMENTS NO. 4:**

9        Produce all documents relating to the assignment or transfer of the lease of the Property

10   to Golden Harvest Alaskan Seafood, including any documents relating to the condition of the

11   Property.

12       **RESPONSE:**

13

14

15   **REQUEST FOR PRODUCTION OF DOCUMENTS NO. 5:**

16       Produce all documents evidencing any communications or discussions, written or oral,

17   between you and Cunningham Lindsey relating to the claim.

18       **RESPONSE:**

19

20   **REQUEST FOR PRODUCTION OF DOCUMENTS NO. 6:**

21       Produce all documents evidencing any communications or discussions, written or oral,

22   between you and Raven Electric relating to the claim, the physical condition of the property or

23   repairs to or renovations of the Property.

24       **RESPONSE:**

25

26

AXIS'S FIRST SET OF REQUEST FOR PRODUCTION OF
DOCUMENTS TO PLAINTIFFS - 7

LAW OFFICES OF
**COZEN O'CONNOR**
A PROFESSIONAL CORPORATION
999 THIRD AVENUE
SUITE 1900
SEATTLE, WASHINGTON 98104
(206) 340-1000

LEGAL\33057557\1

**REQUEST FOR PRODUCTION OF DOCUMENTS NO. 7:**

Produce all documents evidencing any communications or discussions, written or oral, between you and Cummins, Inc. relating to the claim, the physical condition of the property or repairs to or renovations of the Property.

**RESPONSE:**

**REQUEST FOR PRODUCTION OF DOCUMENTS NO. 8:**

Produce all documents evidencing any communications or discussions, written or oral, between you and Nordic Temperature Control relating to the claim, the physical condition of the property or repairs to or renovations of the Property.

**RESPONSE:**

**REQUEST FOR PRODUCTION OF DOCUMENTS NO. 9:**

Produce all documents evidencing any communications or discussions, written or oral, between you and Resolve Marine relating to the claim, the physical condition of the property or repairs to or renovations of the Property.

**RESPONSE:**

**REQUEST FOR PRODUCTION OF DOCUMENTS NO. 10:**

Produce all documents evidencing any communications or discussions, written or oral, between you and David Anderson and/or Anderson Buildings and/or D. L. Anderson, Inc., relating to the claim, the physical condition of the property or repairs to or renovations of the Property.

**RESPONSE:**

LAW OFFICES OF
**COZEN O'CONNOR**
A PROFESSIONAL CORPORATION
999 THIRD AVENUE
SUITE 1900
SEATTLE, WASHINGTON 98104
(206) 340-1000

**REQUEST FOR PRODUCTION OF DOCUMENTS NO. 11:**

Produce all documents evidencing any communications or discussions, written or oral, between you and any other consultant, expert, vendor, contractor, supplier, or other entity, relating to the claim, the physical condition of the property or repairs to or renovations of the Property.

**RESPONSE:**

**REQUEST FOR PRODUCTION OF DOCUMENTS NO. 12:**

Produce all documents relating to or evidencing the physical condition, use, testing, maintenance of, or repairs to, electrical generators located on the property at any time, including all enclosures containing or housing such generators.

**RESPONSE:**

**REQUEST FOR PRODUCTION OF DOCUMENTS NO. 13:**

Produce all documents relating to or evidencing the physical condition or maintenance of, or repairs to, Pier 5 located at the property at any time, including the light fixtures, pilings, fender rail, catwalk, shed, storage bin, cranes, electrical equipment or piping.

**RESPONSE:**

**REQUEST FOR PRODUCTION OF DOCUMENTS NO. 14:**

Produce all documents relating to or evidencing the physical condition or maintenance of, or repairs to, the roof of the "blue shed" located at the property at any time.

**RESPONSE:**

AXIS'S FIRST SET OF REQUEST FOR PRODUCTION OF
DOCUMENTS TO PLAINTIFFS - 9

LAW OFFICES OF
**COZEN O'CONNOR**
A PROFESSIONAL CORPORATION
999 THIRD AVENUE
SUITE 1900
SEATTLE, WASHINGTON 98104
(206) 340-1000

LEGAL\33057557\1

1

2      **REQUEST FOR PRODUCTION OF DOCUMENTS NO. 15:**

3             Produce all documents relating to or evidencing the physical condition, use,

4      maintenance or testing of, or repairs to, the electrical system and any electrical equipment or

5      machinery in the "blue shed" located at the property at any time.

6             **RESPONSE:**

7

8      **REQUEST FOR PRODUCTION OF DOCUMENTS NO. 16:**

9             Produce all documents relating to or evidencing the physical condition or maintenance

10     of, or repairs to, the siding of the "blue shed" located at the property at any time.

11            **RESPONSE:**

12

13     **REQUEST FOR PRODUCTION OF DOCUMENTS NO. 17:**

14            Produce all documents relating to or evidencing the use, testing, physical condition or

15     maintenance of, or repairs to, refrigerator or freezer systems located at the property at any

16     time.

17            **RESPONSE:**

18

19     **REQUEST FOR PRODUCTION OF DOCUMENTS NO. 18:**

20            Produce all documents relating to or evidencing the use, testing, physical condition or

21     maintenance of, or repairs to, the fire suppression sprinkler system in the "blue shed" located

22     at the property at any time.

23            **RESPONSE:**

24

25

26

AXIS'S FIRST SET OF REQUEST FOR PRODUCTION OF
DOCUMENTS TO PLAINTIFFS - 10

LAW OFFICES OF
**COZEN O'CONNOR**
A PROFESSIONAL CORPORATION
999 THIRD AVENUE
SUITE 1900
SEATTLE, WASHINGTON 98104
(206) 340-1000

LEGAL\33057557\1

**REQUEST FOR PRODUCTION OF DOCUMENTS NO. 19:**

Produce all documents relating to or evidencing the physical condition or maintenance of, or repairs to, the habitational units located at the property at any time.

**RESPONSE:**

**REQUEST FOR PRODUCTION OF DOCUMENTS NO. 20:**

Produce all documents relating to or evidencing the ownership, use, physical condition or maintenance of, and/or repairs to, the personal property that you claim was damaged as part of your claim.

**RESPONSE:**

**REQUEST FOR PRODUCTION OF DOCUMENTS NO. 21:**

Produce all documents that you provided to, shared with, or made available to Golden Harvest Alaskan Seafood that related to or evidenced the use, physical condition or maintenance of, and/or repairs to, any property at the Adak facility that you leased.

**RESPONSE:**

**REQUEST FOR PRODUCTION OF DOCUMENTS NO. 22:**

Produce all documents relating to or evidencing that Amy O'Rorke at any time "told Premier Harvest that the value of its claims exceeded $12 million."

**RESPONSE:**

AXIS'S FIRST SET OF REQUEST FOR PRODUCTION OF
DOCUMENTS TO PLAINTIFFS - 11

LAW OFFICES OF
**COZEN O'CONNOR**
A PROFESSIONAL CORPORATION
999 THIRD AVENUE
SUITE 1900
SEATTLE, WASHINGTON 98104
(206) 340-1000

LEGAL\33057557\1

**REQUEST FOR PRODUCTION OF DOCUMENTS NO. 23:**

Produce complete, unredacted copies of all monthly account statements for Premier Harvest's checking and credit/debit card accounts at Whatcom Educational Credit Union (WECU) from Novermber 1, 2015 through the present.

**RESPONSE:**

**REQUEST FOR PRODUCTION OF DOCUMENTS NO. 24:**

Produce complete, unredacted copies of all monthly account statements, from November 1, 2015 to the present, for Premier Harvest's checking and credit/debit card accounts at any other financial institution in which any part of the $3 million advanced to Premier Harvest by AXIS was deposited.

**RESPONSE:**

**REQUEST FOR PRODUCTION OF DOCUMENTS NO. 25:**

Produce all documents related to or evidencing any communications or discussions, written or oral, between you and any employee or representative of the City of Adak, Alaska, between January 1, 2014 and the present.

**RESPONSE:**

**REQUEST FOR PRODUCTION OF DOCUMENTS NO. 26:**

Produce all documents relating to your answer to Interrogatory No. 7.

**RESPONSE:**

AXIS'S FIRST SET OF REQUEST FOR PRODUCTION OF
DOCUMENTS TO PLAINTIFFS - 12

LAW OFFICES OF
**COZEN O'CONNOR**
A PROFESSIONAL CORPORATION
999 THIRD AVENUE
SUITE 1900
SEATTLE, WASHINGTON 98104
(206) 340-1000

LEGAL\33057557\1

1

2   **REQUEST FOR PRODUCTION OF DOCUMENTS NO. 27:**

3       All documents relating to your answer to Interrogatory No. 8.

4       **RESPONSE:**

5

6

7   **REQUEST FOR PRODUCTION OF DOCUMENTS NO. 28:**

8       All documents relating to your answer to Interrogatory No. 11.

9       **RESPONSE:**

10

11

12  **REQUEST FOR PRODUCTION OF DOCUMENTS NO. 29:**

13      All documents relating to your answer to Interrogatory No. 12.

14      **RESPONSE:**

15

16

17  **REQUEST FOR PRODUCTION OF DOCUMENTS NO. 30:**

18      All documents relating to your answer to Interrogatory No. 14.

19      **RESPONSE:**

20

21

22  **REQUEST FOR PRODUCTION OF DOCUMENTS NO. 31:**

23      All documents relating to your answer to Interrogatory No. 15.

24      **RESPONSE:**

25

26

AXIS'S FIRST SET OF REQUEST FOR PRODUCTION OF
DOCUMENTS TO PLAINTIFFS - 13

LAW OFFICES OF
**COZEN O'CONNOR**
A PROFESSIONAL CORPORATION
999 THIRD AVENUE
SUITE 1900
SEATTLE, WASHINGTON 98104
(206) 340-1000

LEGAL\33057557\1

1

2

3

DATED this 7th day of December, 2017.

COZEN O'CONNOR

4

5

6       By: _____
            Thomas M. Jones, WSBA No. 13141
7           Craig H. Bennion, WSBA No. 11646
            William F. Knowles, WSBA No. 17212

8       999 Third Avenue, Suite 1900
        Seattle, WA  98104
9       Telephone: 206.340.1000
        Toll Free Phone: 800.423.1950
10      Facsimile: 206.621.8783

11      Attorneys for Defendant AXIS Surplus Insurance
        Company

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

AXIS'S FIRST SET OF REQUEST FOR PRODUCTION OF
DOCUMENTS TO PLAINTIFFS - 14

LAW OFFICES OF
**COZEN O'CONNOR**
A PROFESSIONAL CORPORATION
999 THIRD AVENUE
SUITE 1900
SEATTLE, WASHINGTON 98104
(206) 340-1000

1

## CERTIFICATE OF SERVICE

2

The undersigned certifies, under penalty of perjury under the laws of the State of
Washington that the foregoing document was caused to be served upon the interested parties at
the address and in the manner indicated below:

3

4

5
Jeffrey I. Tilden, WSBA No. 12219
Greg D. Pendleton, WSBA No. 38361

6
Gordon Tilden Thomas & Cordell
1001 Fourth Avenue, Suite 4000
Seattle, WA 98154

7
Phone:  (206) 467-6477
Email:   gpendleton@gordontilden.com

8
jtilden@gordontilden.com
eevans@gordontilden.com

9
chudson@gordontilden.com

⊠ E-Mail on 12/7/2017
☐ ECF Service
☐ Facsimile
☐ U.S. Mail
☐ UPS Express Courier
⊠ Messenger / Hand Delivery

10
William C. Smart, WSBA No. 8192
Isaac Ruiz, WSBA No. 35237

11
Ian S. Birk, WSBA #31431
Keller Rohrback L.L.P.

12
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052

13
Phone:  (206) 623-1900  Fax:  (206) 623-3384
Email:   wsmart@kellerrohrback.com

14
iruiz@kellerrohrback.com
ibirk@kellerrohrback.com

15
smckeon@kellerrohrback.com
plewis@KellerRohrback.com

16
*Attorneys for Plaintiffs*

⊠ E-Mail on 12/7/2017
☐ ECF Service
☐ Facsimile
☐ U.S. Mail
☐ UPS Express Courier
⊠ Messenger / Hand Delivery

17
Joseph D. Hampton, WSBA No. 15297
Vasudev N. Addanki, WSBA No. 41055

18
Kathryn N. Boling, WSBA No. 39776
Betts, Patterson & Mines, P.S.

19
701 Pike Street, Suite 1400
Seattle, WA 98101-3927

20
Phone:  (206) 292-9988  Fax:  (206) 343-7053
Email:   jhampton@bpmlaw.com

21
vaddanki@bpmlaw.com
kboling@bpmlaw.com

22
*Attorneys for Defendant Cunningham
Lindsey U.S., Inc.*

⊠ E-Mail on 12/7/2017
☐ ECF Service
☐ Facsimile
☐ U.S. Mail
☐ UPS Express Courier
⊠ Messenger / Hand Delivery

23

24
DATED AND SIGNED this 7th day of December, 2017 at Seattle, Washington.

25

26
Diane M. Finafrock, Legal Assistant

AXIS'S FIRST SET OF REQUEST FOR PRODUCTION OF
DOCUMENTS TO PLAINTIFFS - 15

LAW OFFICES OF
**COZEN O'CONNOR**
A PROFESSIONAL CORPORATION
999 THIRD AVENUE
SUITE 1900
SEATTLE, WASHINGTON 98104
(206) 340-1000

LEGAL\33057557\1

# EXHIBIT B

## to

## Declaration of Craig H. Bennion



February 16, 2018

**VIA E-MAIL** (gpendleton@gordontilden.com)

**William F. Knowles**
Direct Phone   206-224-1289
Direct Fax       866-229-5674
wknowles@cozen.com

**Craig H. Bennion**
Direct Phone   206-224-1243
Direct Fax       866-240-3759
cbennion@cozen.com

Greg D. Pendleton
Gordon Tilden Thomas & Cordell, LLP
1001 Fourth Avenue, Suite 4000
Seattle, WA  98154

**Re:      Premier Harvest LLC v. AXIS Surplus Ins. Co.**

Dear Greg:

This letter will address Premier Harvest's Objections and Answers to Axis Surplus Insurance Company's First Set of Interrogatories and Requests for Production to Plaintiffs.  First, we received the Objections and Answers on January 29, 2018 (Dustin's signed verification is dated February 8, 2018).  Objections were due when the discovery originally was due, January 8, 2018. You asked for a ten day extension of time to answer the discovery, but not to object to the discovery.  Even with the extension to answer in place, Premier Harvest failed to answer or object to the discovery by January 18, 2018.  We do not regard the objections as timely under FRCP 33(b)(4) or 34(b)(2); they are therefore waived.   Notwithstanding the untimeliness of the objections, we will address them and the responses below.  We find Premier Harvest's responses to this written discovery incomplete, as explained below, and request a discovery conference to the extent an agreement is not reached.

Request for Production No. 2

Premier Harvest apparently believes only its federal tax returns are responsive to this Request. But the request covers all accounting records, cash and/or asset statements, financial statements, profit and loss statements, and state or local tax returns relating to the plaintiffs.  AXIS is entitled to discover Premier Harvest's financial situation before and after the subject weather events, particularly in light of evidence acquired by AXIS of an intentionally inflated claim or fraud, and in light of Premier Harvest's claim that it suffered financial loss due to AXIS's claim investigation. The accounting records should include the information in Premier Harvest's "QuickBooks" program and any physical business records.  Please advise if Premier Harvest will supplement its response to this Request.

Request for Production No. 4

Premier Harvest objects to this Request on the basis of relevance, but as Premier Harvest admits, the assignment or transfer of the lease to Golden Harvest and related documents are relevant, at minimum, to Premier Harvest's consequential damages claim.  The facts of the transaction require

LEGAL\34525209\1

Greg D. Pendleton
February 16, 2018
Page 2

_____

no expert testimony.   Please advise if Premier Harvest will supplement its response to this Request.

Request for Production Nos. 6-11

Premier Harvest has produced certain documents concerning Raven Electric, Cummins, Resolve Marine, Nordic Temperature Control, and Anderson Buildings, but very few communications with these entities or any others with whom Premier Harvest communicated concerning the weather events, the damage sustained, and its response to the damage.   Premier Harvest's objection is that the repair or renovation of damaged property is not relevant to a claim based on actual cash value coverage.   That is not correct, particularly with regard to a claim where the total final amount of damage had not been determined and further payment had been requested.   Premier Harvest has also used estimates from these very entities to support its claim.   Actual Cash Value is replacement cost minus depreciation, and therefore correspondence relating to these estimates— which Premier Harvest claims represent the replacement cost—is obviously relevant. Regardless, the objection on its face does not apply to all documents evidencing communications or discussions relating to non-repair aspects of the claim and the physical condition of the property.   It seems unlikely that no such documents exist for any entity mentioned in these Requests.   Please advise if Premier Harvest will supplement its response to this Request.

Request for Production Nos. 12-20

These Requests seek information concerning the physical condition, use, testing, maintenance of, or repairs to certain parts of the Adak facility.   Premier Harvest objects on the basis that because the policy provides ACV coverage, the condition, use, etc. of the property after the loss is not relevant to the claim.   This is incorrect, as explained.   Certainly, Premier Harvest cannot take that position with regard to the condition of property after the loss but before any repairs were done.

We recognize that Premier Harvest has provided documents regarding the condition of the property.   Please confirm that it has searched for and produced all such documentation, including any documents in the possession of members of the LLC other than Dustin Anderson. Furthermore, these Requests also encompass information contained on cellphones, in personal email and text messages, and photos taken with cellphones, including information stored in the cloud.

Request for Production No. 21

Premier Harvest objects to this Request on the basis of relevance.   The requested information is directly relevant to Premier Harvest's claim that it lost revenue and was unable to continue operating its business in Adak due to AXIS.   AXIS is entitled to discover all information provided to or exchanged with Golden Harvest, as this bears directly on what Premier Harvest understood was the condition of the property at the time, whether that condition related in any way to the December 2015-January 2016 weather events, and what further repair or work, if any, Premier Harvest believed would be necessary to bring the facility to operational function.   AXIS is entitled to know this from Premier Harvest, not only by way of a third party.   Please advise if Premier Harvest will supplement its response to this Request.

Greg D. Pendleton
February 16, 2018
Page 3

_____

Request for Production Nos. 23 and 24

Premier Harvest claims that the subject of these Requests, its bank records, is irrelevant because those records, and how it expended policy benefits, are "immaterial in the context of a policy providing ACV coverage."  As explained above, this position is incorrect.  After AXIS advanced payments totaling $3 million, Premier Harvest demanded additional insurance funds without establishing that the ACV of weather-caused damage exceeded the amount already paid or that the insurance money had been applied to the restoration of weather-damaged property.  Had Premier Harvest agreed that the $3 million it received represented the total loss amount and no further payment would be sought, then it could have spent the $3 million as it chose.  But there was no agreement.  With further payment demanded, AXIS was obligated to ensure that the ACV of actual storm or freeze damage exceeded what had already been paid and that additional payments would not be applied to property damage for which payment had already been made.

The bank records are evidence of what happened to the insurance funds advanced to Premier Harvest and whether it is entitled to additional payment if it can prove an ACV of covered damage that exceeds that amount.

AXIS is also entitled to discovery of Premier Harvest's bank records because of evidence AXIS obtained that the claim was fraudulent.  Bank and other financial records are material and relevant to an insurer's investigation of fraudulent activity.  *Tran v. State Farm Fire & Cas. Co.,* 136 Wn.2d 214, 224-25, 961 P.2d 358, 363 (1998).

AXIS is entitled to discovery of complete, unredacted copies of the bank records requested, pertaining to its accounts at WECU, Wells Fargo, and any other financial institution.  Please advise if Premier Harvest will supplement its response to these Requests.

Request for Production No. 26; Interrogatory Nos. 6 and 7

Premier Harvest objects to the discovery of other insurance policies and other claims made under those policies on the basis of relevance, and that the discovery would encompass all members of the LLC.  AXIS has obtained evidence of fraud, or at least an intentionally inflated claim.  Insurance claims history or experience of the insured, including members of the LLC, is relevant to AXIS's defense.  Please advise if Premier Harvest will supplement its response to these Requests.

Request for Production No. 27; Interrogatory No. 8

AXIS has requested information concerning Premier Harvest's claim that AXIS's actions affected Premier Harvest's revenue, earnings or business.  AXIS seeks the actual facts that support the claim, if any, and that provide the substance behind the allegations of the complaint, which Premier Harvest repeats in its answer to Interrogatory No. 8.  Premier Harvest may want to employ accounting testimony for its case, but expert testimony should not be required to state the facts of the claim.  Please advise if Premier Harvest will supplement its response to these Requests.

Request for Production No. 28; Interrogatory No. 11

At their exams under oath, Dustin and Lisa Anderson were each asked to identify Premier Harvest's creditors, i.e. from what or whom did Premier Harvest borrow money?  They admitted that Premier Harvest had debt, but both claimed not to remember the names of creditors or the

Greg D. Pendleton
February 16, 2018
Page 4

_____

amount borrowed.  Premier Harvest objects to this inquiry due to burden, stating that it cannot reasonably identify each time an employee performed work and thereby became a "creditor."  The objection is hollow.  As a business, Premier Harvest understands what is meant by "debt" and "creditor."  As part of Premier Harvest's financial situation, the information is relevant to AXIS's defense and its investigation of possible fraud.  Please advise if Premier Harvest will supplement its response to these Requests.

Privilege Log

In your February 9, 2018, email, you stated that no documents were withheld from Premier Harvest's earlier productions.  Is the same true of the recent production of February 12?  You also stated that two documents were redacted, PH_0000617 and PH_0000954, the redactions covering the fact that your client forwarded those emails to you and Jeff.  However, these were not the only redactions in the produced documents.  Redactions also appear on documents PH_0003724; PH_0003730; PH_0003786; PH_0003812; and PH_0003853.  The redacted material might be similar to the redacted parts of 617 and 954, but the emails on those documents are different.  Please include all of these redactions on a privilege log.  In addition, all of the bank statements in Premier Harvest's productions are heavily redacted.  As stated above in connection with Requests for Production 23 and 24, the bank records are all subject to discovery, without redaction.  The productions contained redacted WECU statement for only five months:  January, February, June, July, and August 2016.  The Requests are for records of both WECU and Wells Fargo beginning with November 2015 through the present.  If you refuse to produce unredacted copies of all bank statements, please include all redactions or withheld statements on a privilege log, identifying the information redacted and the basis for withholding that information.

Please promptly respond to this letter.  If disagreement as to these points remains, we request a discovery conference as soon as possible.  We are available Thursday, February 22.  If that date is unacceptable, please contact us with another date.

Sincerely,

COZEN O'CONNOR

William F. Knowles
Craig H. Bennion


cc:     Jeffrey I. Tilden
        William C. Smart
        Ian Birk
        Joseph D. Hampton
        Vasudev N. Addanki
        Kathryn N. Boling
        Thomas M. Jones
        William F. Knowles
        Jonathan Toren

# EXHIBIT C

## to

# Declaration of Craig H. Bennion



10 S. Riverside Plaza, Suite 1550
Chicago, IL 60606
Telephone: 312-454-9200

**Major & Complex Loss – United States**

August 1, 2016

Dustin L. Anderson
Premier Harvest Alaska, LLC

*Via Email: dustin@premierharvest.net*

Re:  Insured:         Premier Harvest Alaska LLC
     Loss Type:       Wind; Water and Freeze
     Date of Loss:    12/13/15; 12/17/15; 01/12/16
     Loss Location:   100 Seawall Road, Adak, Alaska
     Insurer:         AXIS Surplus Insurance Company
     Policy No.:      EAF786108-15
     Policy Period:   03/05/15 – 03/05/16
     AXIS No.:        ATL118099
                      ATL119802
                      ATL120193

Dear Mr. Anderson:

On behalf of AXIS Surplus Insurance Company, I wish to acknowledge receipt of your email of July 23, 2016, and the accompanying documents concerning the property damage claim at Premier Harvest's facility at Adak, Alaska.  You provided this information in response to AXIS's request for a Proof of Loss and for certain supporting information concerning the claim.  These requests were made in my correspondence to you dated March 25, 2016, and April 15, 2016.  In your email of July 23, you did not include a completed and signed Proof of Loss, which was provided to you with my April 15 letter, and the information presented with your email is not sufficient for a Proof of Loss to support your claim under the insurance policy.  For the reasons explained below, AXIS must reject your submission as a Proof of Loss and request that you support your claim as previously requested.

Pier 5

The information submitted regarding covered damage to Pier 5 is not complete.  Your July 22, 2016 narrative states that Resolve Marine assessed the claim, and refers to an attached document.  A one-page estimate by Resolve Marine dated 6/3/16 accompanied the narrative, but it refers to an earlier estimate of 5/25/16, which was not included.  Please provide a copy of the 5/25/16 estimate.

Premier Harvest Alaska, ...
August 1, 2016
Page 2

From your narrative and the 6/3/16 estimate, it is not possible to determine specifically what property you are claiming was damaged in the storm events. The narrative states that Premier Harvest had leased all of the west side of the pier and the north 190 feet of the east side. The damaged piles, walkway or fender rails for which claim is made are not identified as to where they were located, whether within or outside the leased area. Likewise, the piping and conduit below the pier deck for which claim is made are not identified, except that some was knocked down and not all is AXIS's responsibility.

The policy requires that, at the insurer's request, the insured provide "complete inventories of the damaged and undamaged property" including "quantities, costs, values and amount of loss claimed." In our April 15, 2016 letter we requested a full detailed inventory of all property claimed covered by the policy as a result of the weather events. Please provide this information concerning the claimed covered damage to the pier.

Blue Shed

*Roofing*

Your narrative states that wind damaged the roofing above Bay1 West and East, and Bay 2 West, Bay 3 West, and Bay 4 West, and that repairs are underway. The extent of completed repairs or what still needs to be done is not stated, nor are the costs. Please provide quantities, costs and values, with appropriate supporting documentation as to materials and labor for work already completed and for anticipated work necessary to complete the repair.

*Siding*

We have received no information as to the cost of repairs to the siding and large doors of the building. We requested a full detailed inventory of all storm-damaged property. Please submit.

*Insulation*

Please identify where in the building storm-damaged insulation requires replacement, and estimated repair cost.

*Bays 1 & 2 Production Ceiling; Offices*

Please identify where the FRP ceiling system required repair due to the weather events, and estimated repair cost. Also identify the property in the offices damaged by the weather events, how it was damaged, and estimated costs. Again, we requested a full detailed inventory of all storm-damaged property. Please submit.

ASIC_CLM0002265

Premier Harvest Alaska, LLC
August 1, 2016
Page 3

*Electrical*

The information submitted does not identify specifically what electrical equipment was storm-damaged or the cost of repair.

*Refrigeration*

Nordic Temperature Control determined that the system's refrigerant has escaped due to a leak, although the cause of the leak is not verified. Two outdoor condenser baffles are damaged, possibly by wind. The refrigeration system has not been tested and damage from the storm events is not known.

*Boiler*

Nordic examined the boiler and found several components needing replacement. Nordic did not link their condition to the storm events. We have no information concerning the boiler's pre-storm condition or whether it was operational before the storm. Please provide information as to why or how the boiler repair is a part of this claim.

*Power Generation*

The diesel engine of the 2MW Cat generator was confirmed operational and not storm-damaged by the NC Machinery Cat technician. He also found the generator windings saturated with engine oil, which appeared to be old. According to him, the generator in that condition would be dangerous to operate. The oil must be cleaned off the windings. Doing so will eliminate any water in the windings. The technician did not conclude that the generator had been damaged by the storm events or exposure to weather. The storm events may have contributed to damage to the generator enclosure, but the consultants observed conditions in the enclosure that most likely pre-dated the storms. Again, there is no inventory of specific property that was damaged by the storms and that require repair. Please provide if available.

*Fire Sprinkler System*

According to the City of Adak, municipal water to the building was turned off at the time of the weather events. Your narrative states that some of the mains were not fully closed. Regardless of the water supply, the fire sprinkler system is a dry system and if it was operational, it should have been charged with compressed air and freezing would not have been an issue. If part of the system in Bay 1 West was compromised and the air depleted, the system would have charged with water and would have leaked out of the break before the storm. It is not clear how the windstorm could have caused a leak or broken any of the fusable links. As you know, AXIS's consultants are investigating the sprinkler systems in an attempt to determine their condition in each of the bays and to identify what role, if any, the storm had in causing a system rupture. However, regardless of their conclusion as to causation, your submission of July 23 does not include an inventory of damaged property in the sprinkler system that Premier Harvest claims is covered by the AXIS policy.

ASIC_CLM0002266

Premier Harvest Alaska,
August 1, 2016
Page 4

*Items Damaged in Bays 3 and 4*

Your narrative states that damaged items in Bays 3 and 4 were stored in containers and listed on a spreadsheet. You did not include the spreadsheet in your submission. Please send it.

*Dwellings*

When I visited the dwelling units in January I observed some damage and considerable deterioration. I was not able to determine what damage was caused by the wind events of December. It was evident that the property had not been maintained for some time. Your submission of information did not include an inventory of damaged property at the dwelling units.

Proof of Loss

The insurance policy requires that, upon the insurer's request, the insured sign a completed sworn statement in Proof of Loss. I provided the Proof of Loss form in my April 15, 2016 letter. It has not been returned, signed before a notary public. As explained above, the information we received on July 23 is not sufficient for AXIS to determine specifically what property is being claimed damaged by the windstorm or the amount of the claim. I have again enclosed a Proof of Loss form. Please complete it and sign before a notary public, and return it by August 31, 2016, with whatever information and documentation necessary to support the claimed property and amounts, including all information previously requested. As stated above, the information submitted on July 23, 2016, cannot be accepted as a Proof of Loss for this claim.

Any proof of loss that is submitted by you in the future will be considered an entirely new document and will be accepted or rejected based solely on the representations or lack of representations contained therein.

Request for Additional Funds

You have requested additional money for insulation, refrigeration, hardware, electrical and power generation, and equipment and supplies damaged in Bays 3 and 4. Premier Harvest has already received payment of $3,000,000 for this claim. Before any additional funds can be made available, AXIS will need a complete and detailed accounting of how the $3,000,000 has been spent, with appropriate supporting documentation. All of the money previously disbursed must have been used for expenses covered by the policy. Obviously, covered property damage cannot be paid twice. Once AXIS has determined that the money already paid has been used for matters within the policy coverage, it can consider further payments if covered.

ASIC_CLM0002267

Premier Harvest Alaska, L  ...
August 1, 2016
Page 5

<u>Reservation of Rights</u>

As indicated in the past, AXIS is conducting this investigation under a full reservation of its rights and defenses under and pursuant to its actual cash value insurance policy.  AXIS is not waiving any of the terms and conditions of the policy, and any interaction between the individuals investigating the claim on behalf of the company and the insured or its duly authorized representatives should not be viewed as any indication that the company has acknowledged liability for any part of this loss.

Very truly yours,

Cunningham Lindsey

By Amy O'Rorke, CPCU, AIC, SCLA, ARM, GRP
Executive General Adjuster
(Email address:  aororke@cl-na.com)


CC:    Telquist Ziobro McMillen Clare, PLLC
       Attn: Robert G. McMillen
       Via Email: rob@tzmlaw.com

       Axis Insurance Company
       Attn: Stephen Lajewski
       Via Email: stephen.lajewski@axiscapital.com

ASIC_CLM0002268

**EXHIBIT D**

**to**

**Declaration of Craig H. Bennion**

1

1              UNITED STATES DISTRICT COURT

2              WESTERN DISTRICT OF WASHINGTON

3                      AT SEATTLE

4

5    PREMIER HARVEST LLC, a        )
     Washington Limited Liability)
6    Company;PREMIER HARVEST LLC,)
     an Alaska Limited Liability )
7    Company; PREMIER HARVEST     )
     ADAK LLC, an Alaska Limited )
8    Liability Company,           )
                                  )
9              Plaintiffs,        )
                                  )
10       vs.                      )      NO. 17-CV-00784-JCC
                                  )
11   AXIS SURPLUS INSURANCE       )
     COMPANY, a Foreign           )
12   Corporation; CUNNINGHAM      )
     LINDSEY U.S., INC., a        )
13   Foreign Corporation,         )
                                  )
14             Defendants.        )

15
               DEPOSITION UPON ORAL EXAMINATION OF
16                      ROBERT McMILLEN

17

18

19                    July 19, 2018

20                 Richland, Washington

21

22
            TAKEN AT THE INSTANCE OF THE DEFENDANT
23              AXIS SURPLUS INSURANCE COMPANY

24
     REPORTED BY:
25   DORENE BOYLE

37

```
 1         entities.
 2    Q.   Are you working based on an hourly rate?
 3    A.   Yes.
 4    Q.   And that's for Premier Harvest?
 5    A.   For Dustin and Lisa and Premier Harvest and its -- and
 6         his other entities, yes.
 7    Q.   You know that Dustin and Lisa are divorced?
 8    A.   I am aware of that, yes.
 9    Q.   Have you continued to represent Lisa?
10    A.   I would consider her my client, yes.
11    Q.   Why?
12    A.   I don't know if she would consider me her lawyer, but
13         I consider her my client.
14    Q.   How is she your client?
15    A.   I haven't had communication with her in months, if not
16         years, and I have a reasonable belief that she is
17         still my client, and she hasn't told me that I'm not
18         her lawyer, if that makes sense.
19    Q.   Have you had any contact with John Price?
20    A.   The name rings a bell.  I can't remember why that name
21         rings a bell, but I don't recall specific
22         conversations with him, no.
23    Q.   Okay.  Do you recall that John Price was an accountant
24         for Premier Harvest?
25    A.   I do now, yes.  That helped me.  Thank you.
```

38

2   1    Q.   Now with that context, do you recall the contact you

2        had with him concerning Premier Harvest?

3    A.   It would probably have been in the context of we need

4        to document this claim and there's some accounting

5        that needs to be done and we need help with it.

6    Q.   And why did you need to document the claim?

7    A.   That was a request by the insurer.

8    Q.   Did that seem to you to be a reasonable request?

9    A.   It did, yes.

10   Q.   Did then Mr. Price undertake the task of trying to

11       document the claim?

12   A.   I believe he did.

13   Q.   Did you receive that documentation?

14   A.   I'd be surprised if I didn't.

15   Q.   Did not?

16   A.   Didn't.  Yeah, I'd be surprised if I did not receive

17       it.

18   Q.   Do you recall reviewing it?

19   A.   The extent of my review would have been to look at --

20       just glance at numbers and see generally what the

21       document was.  I have a tendency to shut off when it

22       comes to spreadsheets.

23   Q.   So you recall that he sent spreadsheets?

24   A.   I believe he did, yes.

25   Q.   Do you recall if he also provided the backup for those

```
1         it became Exhibit 19?
2    A.   Am I aware of the changes?
3    Q.   I don't even -- No, I don't even -- I'm not even
4         suggesting there were any changes.  I'm just asking if
5         you're aware of any changes?
6    A.   I would suspect that this Exhibit 18 is a draft of
7         Exhibit 19, there would be changes, yes.
8    Q.   All right.  Do you recall what those changes were?
9    A.   Again, it would be evident from the pieces of paper
10        you've handed me.
11   Q.   But you don't have an independent recollection of what
12        they would be?
13   A.   I don't.
14                      (DEFENDANT AXIS' EXHIBIT NO. 20
15                       MARKED FOR IDENTIFICATION).
16   Q.   I'm handing you what has been marked as Exhibit 20.
17        Would you identify that, please.
18   A.   October 3rd, 2016 letter on Cozen O'Connor letterhead
19        addressed to me, signed by Thomas Jones, I believe,
20        but I don't recognize that signature.  I guess there's
21        a "B" that I would recognize in there, which would
22        suggest it came from Craig Bennion.
23   Q.   Do you recall receiving this letter?
24   A.   I'm sure I did.
25   Q.   Do you recall at this point the attorneys for AXIS
```

```
 1         requesting information?
 2    A.   The question is do I recall AXIS asking for more
 3         information or Mr. Bennion asking for more
 4         information?
 5    Q.   Yes.
 6    A.   To the extent that's in this letter, that would be it,
 7         yes.
 8    Q.   In the letter Mr. Bennion states that, "AXIS has not
 9         receive the requested accounting and still does not
10         know how the money previously advanced has been
11         applied to the claimed loss or whether the entire
12         $3,000,000 has in fact been spent."  Do you see that?
13    A.   I do.
14    Q.   Did you ever object to responding to that request for
15         an accounting?
16    A.   I did not object, not that I recall.
17    Q.   Did you understand why AXIS wanted that information?
18    A.   It would be a presumption that that's part of their
19         duty of cooperation, yes.
20               MR. BIRK:  Object to form as to what AXIS
21         thought.
22    Q.   I'm not asking you to speak for AXIS.  I'm just asking
23         as to your understanding.
24               Did you understand why they wanted the
25         information?
```

1              MR. BIRK:  Same objection.

2    A.   Yes, I did.

3    Q.   What was your understanding?

4    A.   It was a deponent of the duty to cooperate.

5    Q.   What do you mean by that?

6    A.   The insured has a duty to cooperate with the insurer.

7    Q.   How does that fit with the request of documentation of

8         what has been spent so far?

9              MR. BIRK:  Objection to form.

10   A.   Again, it didn't seem to me to be an unreasonable

11        request.

12   Q.   Okay.  Do you know if that information was ever

13        provided?

14   A.   I believe it was.

15                  (DEFENDANT AXIS' EXHIBIT NO. 21

16                  MARKED FOR IDENTIFICATION).

17   Q.   I'm going to hand you what has been marked as Exhibit

18        21.  Can you identify that, please.

19   A.   Letter from Cozen O'Connor to myself dated November

20        10th, 2016.  It's not signed, but the signature line

21        is for Thomas M. Jones or Craig H. Bennion.

22   Q.   And did you receive this letter?

23   A.   I'm sure I did.

24   Q.   In this letter the author raises the fact or makes a

25        statement that "The spreadsheets and receipts

1          submitted to date do not distinguish property replaced

2          or repairs made necessary due to storm damage from

3          replacement of property or repairs that were due to

4          pre-storm conditions."  Do you see that?

5     A.   I do.

6     Q.   I understand you may have an aversion to spreadsheets,

7          but do you recall reviewing these spreadsheets that

8          are referenced in there letter?

9     A.   I did not review them in any detail.  I remember

10         glancing at them.

11    Q.   Do you recall, this letter that's marked as Exhibit

12         21, did you share this with your client?

13    A.   I'm sure I did.

14    Q.   Okay.

15                        (DEFENDANT AXIS' EXHIBIT NO. 22

16                        MARKED FOR IDENTIFICATION).

17    Q.   Handing you what has been marked as Exhibit 22, can

18         you identify that, please.

19    A.   December 13th, 2016 correspondence from Cozen O'Connor

20         to myself regarding the claim, and I would suspect

21         that that's Mr. Bennion's signature.

22    Q.   Do you recall receiving this letter?

23    A.   I do.

24    Q.   And do you recall sharing this letter with your

25         client?

```
 1                    C E R T I F I C A T E

 2

 3   STATE OF WASHINGTON)
                        ) ss.
 4   COUNTY OF YAKIMA   )

 5             THIS IS TO CERTIFY that I, Dorene Boyle,

 6   Certified Court Reporter in and for the State of Washington

 7   residing at Yakima, reported the within and foregoing

 8   deposition; said deposition being taken before me as a

 9   Certified Court Reporter on the date herein set forth; that

10   the deponent was first by me duly sworn; that said

11   examination was taken by me in shorthand and thereafter

12   under my supervision transcribed, and that same is a full,

13   true and correct record of the testimony of said deponent,

14   including all questions, answers and objections, if any, of

15   counsel.

16

17             Further certify that I am not a relative or

18   employee or attorney or counsel of any of the parties, nor

19   am I financially interested in the outcome of the cause.

20

21             IN WITNESS WHEREOF I have hereunto set my hand

22   this      day of            , 2018.
```

```
23

24   CERT/LIC NO. 2521
                         Certified Court Reporter in and for the
25                       State of Washington, residing at Yakima
```

1   Reference No.: 2368534

2

3   Case:  HARVEST V. AXIS

4

        DECLARATION UNDER PENALTY OF PERJURY

5

        I declare under penalty of perjury that

6   I have read the entire transcript of my Depo-
    sition taken in the captioned matter or the

7   same has been read to me, and the same is
    true and accurate, save and except for

8   changes and/or corrections, if any, as indi-
    cated by me on the DEPOSITION ERRATA SHEET

9   hereof, with the understanding that I offer
    these changes as if still under oath.

10

11          _____

12              Robert Gene Mcmillen

13

14             NOTARIZATION OF CHANGES

15                  (If Required)

16

17  Subscribed and sworn to on the _____ day of

18

19  _____, 20____ before me,

20

21  (Notary Sign)_____

22

23  (Print Name)                        Notary Public,

24

25  in and for the State of _____



**EXHIBIT E**

**to**

**Declaration of Craig H. Bennion**

1    ***** ROUGH DRAFT OF LISA ANDERSON TAKEN AUGUST 20, 2018 ***

2            THE VIDEOGRAPHER: We're now on the

3    record.  The time is 9:02.  This is the start of media

4    labeled one of the video recorded deposition of Lisa Anderson

5    in the matter of Premier Harvest, LLC of versus AXIS Surplus,

6    et.al., in United States District Court Western District of

7    Washington at Seattle, Case No. 2:17-cv-00784-JCC.

8        This deposition is being held at Cozen O'Connor located

9    at 999 Third Avenue, Suite 1900, Seattle, Washington on

10   August 20th, 2018.  My name is Marshall Fox, I'm the legal

11   video specialist from Esquire Deposition Solutions located at

12   701 Fifth Avenue, Suite 4200, Seattle, Washington.  The court

13   reporter is Kim Scheuerman in association with Esquire.

14       Will counsel now introduce themselves for the record.

15           MR. TILDEN:  Jeff Tilden for the

16   plaintiff, Premier Harvest.

17           MR. KNOWLES:  William Knowles for AXIS

18   Insurance Company.

19           MR. ADDANKI:  Vasudev Addanki on behalf

20   of Cunningham Lindsey.

21           THE VIDEOGRAPHER:  Thank you.  Will the

22   court reporter please swear in the witness.

23

24       LISA ANDERSON

25

1

1  Q.  Was there any change in terms of liability teach member would

2     have with respect to the LLCs as a result of the divorce?

3  A.  No.

4  Q.  Have you ever discussed the insurance claim with Dustin?

5  A.  Yes.

6  Q.  When was the last time you discussed the claim with him?

7  A.  It was 2017.  I want to say about the end of March, first

8     part of April.

9  Q.  Do you recall what you discussed with him at that time?

10  A.  I do not.

11  Q.  Do you recall any of your discussions that you had with with

12     Dustin with respect to the insurance claim?

13  A.  Of course I do, we were married and were running the company

14     so we had discussions all the time about our business.

15  Q.  Did you ever discuss with Dustin or did he discuss with you

16     inflating the claim?

17  A.  No.

18  Q.  When you were -- when were you last actively involved with

19     Premier Harvest Adak?

20  A.  April.  End of March, first part of April of 2017.

21  Q.  So what happened at that point for things to change and you

22     were no longer active?

23  A.  Well, it was a very messy divorce and Dustin was a managing

24     member.  So he made those decisions.

25  Q.  Prior to April or so of 2017, what was your role with respect

6

1     to Premier Harvest Adak?

2   A.  Could you repeat that.

3   Q.  Prior to April 2017, what was your role with Premier Harvest

4     Adak?  We know you're a member but what tasks duties and

5     responsibilities did you have?

6   A.  Sure.  I over saw Ellie Garcia, which was our office manager.

7     I worked a bit with John Price our accountant.  I worked with

8     our cooks that were in Adak, the cleaning crew.  There was a

9     problem with anything that had to do with the office or that

10     end of employees then I would deal with that.

11   Q.  Were you responsible for keeping the books for the entity?

12   A.  No, I was not.  I was responsible to oversee it.  Once I

13     hired Ellie she worked with our bookkeeper, John Price, our

14     accountant, and they had a pretty good grasp of what was

15     going on and if she had questions, that they could not answer

16     or if they had questions she could not answer then I would

17     step in.

18   Q.  Do you know what program Premier Harvest Adak used to

19     practice their expenses?

20   A.  QuickBooks.

21   Q.  Are you familiar with the QuickBooks program?

22   A.  Well, I've never had formal training.  Kind of worked my way

23     through it so I would use just part of it that I knew how to

24     use.

25   Q.  Did you know how to make journal entities?

7

1    A.  I did not.

2    Q.  Who made the journal entries for Premier Harvest Adak?

3    A.  John Price our accountant.

4    Q.  Who coded the entries?

5    A.  Could you expand on that?

6    Q.  Are you aware that there was a general ledger kept through

7         QuickBooks?

8    A.  Yes.

9    Q.  Were you aware that those expenses that were tracked in the

10        general ledger were assigned a code?

11   A.  I believe I know what you're talking about.

12   Q.  Okay.  Tell me what you believe I'm talking about so we're on

13        the same page.

14   A.  Sure.  If it were payroll, if it were supplies, if it were,

15        you know things like that it was coded to that.

16   Q.  Did you -- do you know if Premier Harvest Adak ever create

17        add code for the insurance claim?

18   A.  It's been so long.  I'm sure -- I mean I believe I would have

19        to look at it to see.

20   Q.  You would need to look at that whatever was entered into

21        QuickBooks?

22   A.  Sure.  Yes.

23   Q.  Do you know what the status is of that QuickBooks account?

24   A.  I do know what the status is.

25   Q.  What is the status?

8

1    A.  Status is that because of non payment QuickBooks deleted all

2       of our information.

3    Q.  Okay.  And do you know when that occurred?

4    A.  I don't exactly know when.  I'm trying to recall when my

5       attorneys called and asked me a couple of questions about it.

6       I think they called in February or March of this year.  When

7       it was deleted, I don't remember.  I know that there was a

8       credit card on file and it -- something happened and it

9       didn't get charged and we thought it got charged and didn't

10      have any idea what happened or what would happen until we

11      went to retrieve that information and it was gone.

12   Q.  Were you aware that -- strike that.

13         Do you know when this litigation started?

14   A.  Off the top of my head, no.

15   Q.  Based upon your recollection of how events transpired, were

16      the QuickBooks data deleted after the litigation started?

17            MR. TILDEN:  No foundation.  Go ahead.

18   A.  Deleted after, I believe so, yes.

19   Q.  Do you know what steps Premier Harvest Adak took to preserve

20      that information before it was deleted?

21            MR. TILDEN:  Same objection.  Go ahead.

22   A.  I don't believe that we had a back up because initial flee we

23      didn't have the information in the cloud and so we would do a

24      back up just on a memory stick when we were still in

25      Bellingham.  Then we upgraded to QuickBooks and everything

9

1    running crab and didn't count the hours or a day or 24-hour

2    period in the -- in that -- let's see, the best word for

3    it -- she did not allocate those expenses when the guys were

4    off loading and packing crab.

5    Q.  And you reviewed Ellie's work with respect to that

6    allocation?

7    A.  Well, I had a lot of confidence in her.  I didn't review it

8    in detail to go back through the time cards and check

9    everything.  She was pretty detailed and I had good

10    confidence in her.

11    Q.  Since then have you -- after that information has been

12    submitted to the insurance company, have you gone back to

13    review it to make sure it was accurate?

14    A.  No.

15            MR. KNOWLES:  That's all the questions I

16    have.  Thank you.

17            THE WITNESS:  Okay.

18            MR. TILDEN:  I have nothing else.  We

19    would like to read it.

20            THE VIDEOGRAPHER:  This is the deposition

21    of Lisa Anderson.  The time is 3:13.  We're now off the

22    record.

23        Adjourned 3:15

24

25

137

# EXHIBIT F

## to

# Declaration of Craig H. Bennion

**Finafrock, Diane**

---

| | |
|---|---|
| **From:** | Ian Birk <ibirk@KellerRohrback.com> |
| **Sent:** | Wednesday, February 28, 2018 4:11 PM |
| **To:** | Bennion, Craig; Greg D. Pendleton |
| **Cc:** | Knowles, William F.; Toren, Jonathan; Jones, Thomas M.; Jeff Tilden; Will Smart; Isaac Ruiz |
| **Subject:** | RE: Premier Harvest -- Discovery "meet and confer" meeting of Friday, February 23, 2018 |

Craig,

Please see responses in-line below.

Regards,

Ian

----------------------------------------

Ian S. Birk
Attorney - Keller Rohrback L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA  98101
Phone: (206) 623-1900
Fax: (206) 623-3384
Email: ibirk@kellerrohrback.com

---

**From:** Bennion, Craig [mailto:CBennion@cozen.com]
**Sent:** Monday, February 26, 2018 9:34 AM
**To:** Greg D. Pendleton <gpendleton@gordontilden.com>; Ian Birk <ibirk@KellerRohrback.com>
**Cc:** Knowles, William F. <WKnowles@cozen.com>; Toren, Jonathan <JToren@cozen.com>; Jones, Thomas M. <TJones@cozen.com>; Jeff Tilden <jtilden@gordontilden.com>; Will Smart <wsmart@KellerRohrback.com>; Isaac Ruiz <iruiz@KellerRohrback.com>
**Subject:** Premier Harvest -- Discovery "meet and confer" meeting of Friday, February 23, 2018

Greg and Ian,

We write to confirm what we discussed at our meeting on Friday, February 23, at Greg's office.  Please let us know if any of the information below is incorrect.

As a general matter, you indicated that although you disagree with certain legal contentions made in our letter of February 16, 2018 and have made certain objections, you are not actually withholding any responsive documents (except for a few possible issues noted below).  Rather, you stated that you have received Premier Harvest's email server (which explains the almost total lack of emails produced to date) and a large batch of hard copy documents, and that you will produce any responsive documents you are able to locate with due diligence.  These include:

- Documents related to the Golden Harvest transaction and operations;
- Communications with DL Anderson and other contractors both before and after the storm;
- Documents relating to condition of the property and repairs from both before and after the storm, including the repairs allegedly conducted by DL Anderson in 2014;
- Documents relating to Premier Harvest's initial occupation of the property and assumption of the lease;

1

- QuickBooks records;
- Fish tickets from 2014-2015 and other documents reflecting Premier Harvest's productivity, sales and cash flow both before and after the storm.

**Craig: this is correct. The QuickBooks electronic data was stored in a "cloud" server and was deleted by the service when its bills were not paid. The bills did not get properly forwarded when Dustin and Lisa divorced. The underlying information still exists. The result is that neither we nor you will have it in the QuickBooks format. We will recover the QuickBooks electronic data if we can, but I am not hopeful.**

You indicated that you will look for responsive photos and text messages from phones, to the extent possible.

**We will reach out to the LLC members for this because you asked. I do question the extent to which an LLC has legal control over its members' personal phones. We will reach out regardless. It will take a little time.**

You stated that you have approached or will approach all LLC members for responsive documents, not only Dustin.

**We have worked primarily with Dustin, Lisa, and Mr. Bermudez. At your request, we will be sure to reach every LLC member.**

With respect to electronic materials, you stated you would get back to us as to the search terms Premier Harvest will be utilizing to locate documents responsive to AXIS's discovery requests.  We indicated that if the search terms are more restrictive than anything related to the Adak property, the scope of your search may become an issue in terms of whether Premier Harvest has fully complied with the requests, and thus it would be preferable to consult with us and agree on the search terms before motions are filed with the Court.  You could not commit to sharing the search terms but stated you would discuss this possibility internally.

**This correctly summarizes our discussion. I have not looked at this in detail at this point. I will get back to you.**

Other specific RFPs and topics of discussion:

Bank Statements (RFP 23 and 24): You indicated you would produce documents from Premier Harvest's WECU and Wells Fargo accounts from November 1, 2015 and on.  You stated these are the only two accounts that Premier Harvest has maintained during the relevant period.  With respect to redactions of "personal financial information," you stated you would discuss this issue with your clients and get back to us.  You did not assert that there was any privilege that applied to the information redacted from the bank statements, but you did not have authority to agree to eliminate the redactions.  We repeated our position that unredacted bank records, including monthly beginning and ending account balances and all deposits and withdrawals, are relevant to Premier Harvest's ongoing demand for additional insurance payments, beyond the $3M already paid.  The unredacted records are also relevant to AXIS's defense of concealment or fraud.

**We believe the bank statements are irrelevant. In spite of this, they will be produced without redaction. After checking, we do not believe Premier Harvest had any bank accounts from November 1, 2015 to the present other than the WECU and Wells Fargo (payroll) accounts.**

Financial Statements (RFP 2): You indicated there may be more responsive documents in the hard copy documents Keller Rohrback has received in the last few days.  You acknowledged that Premier Harvest has legal control of documents in John Price's possession, that John Price does have a stack of additional documents not produced to date, and that you will be producing these documents in response to Axis's RFPs.

**Hard copy documents have been retrieved from Bellingham. Dustin is on Adak today and will be bringing back some additional hard copy documents he located there. We have been told that Mr. Price has put hard copy documents in the mail. If responsive documents are not produced, we will identify them and produce a privilege log.**

Golden Harvest documents (RFP 4 and 21); communications with consultants and contractors (RFPs 6-11); documents relating to the condition of the property (RFPs 12-20): Again, you indicated you would provide any responsive documents and would not stand on your relevance objection.

**My notes are not quite as sweeping as this statement seems from the number of identified RFPs, but this is correct that we will produce Golden Harvest documents and documents relating to work done on the property or the condition of the property.**

Other insurance claim information (RFP 26) and Creditor Information (RFP 28): You asserted these requests are overbroad but that you would circulate a compromise proposal before next Wednesday.  With respect to creditor information, we stated our position that all of this information is necessary for purposes of obtaining a clear picture of Premier Harvest's financial situation before and after the storm, as it relates to Premier Harvest's consequential damages claim.

**We are not aware of other Premier Harvest insurance claims, though there was at least one claim with Alaska Air relating to a misplaced shipment. We do not know where specifically related documents would be found. I will contact Premier Harvest's insurance producers to see if there are additional claims that we need to discuss in relation to this RFP. I will let you know if any other claims are identified, in which case I believe we should revisit the question of document production.**

**Premier Harvest will produce documents related to its efforts to obtain financing.**

Documents relating to how Premier Harvest's business was harmed (RFP 27):  We disagreed regarding the level of detail required in response to the associated Interrogatory No. 8, but agreed the Interrogatory need not be addressed to the Court by the March 1 deadline which only applies to document-related requests.  You stated you would try to provide a more detailed response to the interrogatory.   As for RFP 27, you stated you would provide more financial information and documents from the hard copies and servers you recently obtained, as discussed above with respect to RFP 2.

**I have re-read Premier Harvest's answer to interrogatory no. 8 and I believe it appropriately answers the question. The loss events seriously harmed the operational capabilities of the Adak facilities. Premier Harvest's answer to interrogatory no. 8 states its contention that incomplete and untimely loss adjustment by AXIS made it impossible for Premier Harvest to effectuate repairs to carry on operations there. We contend that this caused damages, but we cannot calculate the amount without expert work that has not been completed.**

You stated you would provide a progress report on all of these issues before next Wednesday.

Best regards,
Craig

**Craig H. Bennion**
**Member | Cozen O'Connor**
999 Third Avenue, Suite 1900 | Seattle, WA 98104
P: 206-224-1243 F: 866-240-3759
Email | Bio | LinkedIn | Map | cozen.com

***Notice: This communication, including attachments, may contain information that is confidential and protected by the attorney/client or other privileges. It constitutes non-public information intended to be conveyed only to the designated recipient(s). If the reader or recipient of this communication is not the***

intended recipient, an employee or agent of the intended recipient who is responsible for delivering it to the intended recipient, or you believe that you have received this communication in error, please notify the sender immediately by return e-mail and promptly delete this e-mail, including attachments without reading or saving them in any manner. The unauthorized use, dissemination, distribution, or reproduction of this e-mail, including attachments, is prohibited and may be unlawful. Receipt by anyone other than the intended recipient(s) is not a waiver of any attorney/client or other privilege.

**EXHIBIT G**

**to**

**Declaration of Craig H. Bennion**

1

1 UNITED STATES DISTRICT COURT

2 FOR THE

3 WESTERN DISTRICT OF WASHINGTON

4 _____

5 PREMIER HARVEST, LLC., et.al.,                )
                                               )
6                                               )
                   Plaintiff,                   ) Case No.
7                                               )
            vs.                                 ) 2:17-cv-00784
8                                               ) -JCC
   AXIS SURPLUS INSURANCE COMPANY and            )
9  CUNNINGHAM LINDSEY U.S., INC.,                )
                                               )
10                                              )
                   Defendants.                  )
11

12 _____

13

14 DEPOSITION OF JOHN PRICE
                    August 15, 2018
15                  Seattle, Washington

16

17

18

19

20

21

22

23

    Reported by:
24  Kim Scheuerman
    CCR No. 2517
25  Job No. J2368540

11

1   A.  Well, I've heard snippets about it over the last two years.

2   Q.  Tell me everything you've heard about it.

3   A.  I -- that's quite a question.

4   Q.  And I would like an answer.

5   A.  Well, basically, there was Dustin -- this will be a long

6       answer, as you've requested.  Dustin had spent considerable

7       money ramping up his seafood operation in Adak.  He jumped

8       through a lot of hoops and had raised about a million and a

9       half, almost $2 million capital to improve a facility there.

10      And his edge primarily was the fact that he had developed a

11      system where he could sell live crab at a considerable margin

12      to these oriental markets.

13          And so he was there, he had -- I know we had tracked at

14      that time, two years ago, about a million and a half in

15      improvements to the building and had built up a relationship

16      with all of the fishermen in the area.  In fact, he was

17      practically the only facility that could take on that in the

18      area, the crab, and basically had the carpet pulled out from

19      under him with two typhoons, which pretty well shut him down.

20          The plant was in big disrepair, I guess, or greatly

21      damaged, which would not allow him to operate.  And so, as a

22      matter of fact, up to the time he required more capital to

23      ramp up prior to this hurricane.  He had financing procured

24      through a -- I think her name Adrian Worley.  If this typhoon

25      would have happened about a week after, he would have had

1    that financing to the tune of another million and a half

2    dollars.  But the timing was peccable.  She pulled out

3    because the typhoon classified him as not a going concern, in

4    my opinion, until the facility could be repaired.

5        And then in the midst of all of this, he -- Dustin had

6    gone through a divorce, which required much more time on my

7    part because the QuickBooks that he had kept and actually

8    that -- they had hired a lady out of Kennewick who was doing

9    the bank reconciliations and so forth.  I had -- well, what

10   my primary function was just to prepare the tax returns, and

11   I had decent statements I had confidence in that I prepared

12   the tax returns off of -- from.

13       And then -- but, anyway, he had gone through a divorce,

14   and about four months ago Dustin flew me up and wanted me to

15   kind of complete things.  And he went to pull up the

16   QuickBooks, which was over the Internet and found out that

17   they had destroyed all of the records because of non payment

18   about a month ago.  It was amazing.  Which required them to

19   redo all of the books for '16 and '17, which I did, which was

20   quite a job to basically redo all of the books for '16 and

21   '17.  And that basically consumed most of my work for the

22   last -- about the last two months.

23       Not only that, but getting Dustin to sit down with me

24   to help on a lot of the coding issues, you know, the

25   transactions where I could properly classify them into the

1        general ledger.  Then -- that's about it.

2             I -- he -- in my estimation, Dustin had an edge where

3        the other seafood operators didn't.  His edge was the fact

4        that he had great margins that the demand for live crab was

5        solid.  And he had -- he had spent considerable time

6        developing those markets and demand for that.  Tremendous

7        margins.  Alaska Airlines was dependable because they

8        provided the means to transport the live crab.

9             And then also he had invented this cooking operation

10       where the crab, which was I think about half of the crab that

11       came through there was -- would not be live for various

12       reasons.  And so he developed a system where he could cook

13       the crab very quickly and promote and sell that at a reduced

14       price.

15            And then also he -- he also developed a system where he

16       could keep crab live.  He had these totes made where they

17       would pump down oxygen into the totes with special seawater

18       that would keep the crab alive much longer.  And he was

19       ramped up ready to go, and the timing was terrible for him to

20       prove his operation.

21            He was successful prior to that, but he was just

22       getting ready to go when the -- I guess they call them

23       typhoons -- when the typhoons hit.  How much money he would

24       have made with it, I don't know.  I'm not a specialist in

25       that category, but as I understand, the operation that bought

1      to develop a market for live crab in China and Korea and so

2      forth, he's been out there a lot.  And he's been very hard to

3      get ahold of because he's been out there.  And he's

4      developing a brokerage business now to do -- more or less

5      he's not in the processing, but he's in the brokering.  Much

6      less headaches.  Gee, I can't image the headaches he went up

7      there -- he endured up there.  And I know what seafood -- the

8      headaches that come through the seafood business.  Gee, it's

9      just --

10  Q.  So your understanding at least prior to the storm was that

11      Lisa and/or Ellie were maintaining the general ledger?

12  A.  Yes.

13  Q.  And was it Lisa and/or Ellie that were coding the entries?

14  A.  Yes.  And then -- but at that time up through I think the end

15      of -- about the first part of '16, they had a real good lady,

16      I think her name was Sheila Goody out of Kennewick.  And she

17      could pull it up on her system and reconcile the bank and

18      help with some of the coding issues.  She was very good.

19  Q.  Do you know why that relationship ended between Premier

20      Harvest and Sheila Goody?

21  A.  As I understand, she moved from Kennewick with her husband

22      somewhere to retire.  And then in and around about that same

23      time when she moved when they lost Sheila, their marriage

24      failed.  And then basically the only person that was kind of

25      half handling the activity was Ellie.

1    Q.  Did you -- when you reviewed the general ledger prior to the

2         storm, did you ever ask questions, clarifications as to

3         particular entries?

4    A.  All the time.  Well, not prior.  You know, if I saw something

5         weird, I would call on it.  You know, that's my job.  You

6         know, if I see something weird, I'll ask on it.  Even as a

7         tax preparer, that's part of your fiduciary duty to do that.

8         But I got really involved this last couple of months.  Gee,

9         I --

2  10   Q.  Let me ask you about that.  The QuickBooks you mentioned, you

11        called somebody and they said you were a month too late or

12        five months too late or something like that?

13   A.  I was sitting there in Dustin's apartment there with him.

14        Because I was there -- I was there -- I was going to give him

15        three or four days of work.  I can get through stuff, I'm a

16        no nonsense guy, I push through things and get them done

17        because this was urgent, gee, I could not understand why this

18        wasn't -- well, number one in Dustin's mind is to provide a

19        living, but shoot, this is a very big issue.

20   Q.  Why did you consider it urgent?

21   A.  Because the whole viability of this claim was contingent upon

22        having financial statements, as I had understood it.  And

23        so -- but anyway, we were sitting there and he called up the

24        QuickBooks people saying, here I am, here's the code.  Oh,

25        we're really sorry, you've been two months late on your

1      thing.  I said, well, yeah, but you've got it on the cloud

2      somewhere and said, sorry, no.  I was amazed.  It wasn't even

3      archived somewhere in the cloud.  It wasn't.

4  Q.  You said this was five months ago?

5  A.  Yeah.  About five months ago.  It was early this year,

6      February, March, something like that.  And it was a bad time

7      for me.

8  Q.  Bad time because it's tax season?

9  A.  Yes, sir.  Gosh, I --

10 Q.  Again, before the storm, how would you access Premier

11     Harvest's general ledger?

12 A.  I would get a printout.  Just get a printout.  That's all I

13     needed.  Just get a printout of the balance sheet and income

14     statement.  I would look at it, and if anything looked weird,

15     I would call and ask.  Sometimes I would call and talk to

16     Sheila about it.  If something looked weird we would discuss

17     it.  If it was a coding issue, we would either revise it or

18     leave it alone.

19 Q.  Did you -- there was -- somebody had certainly suggested in

20     testimony that you had access to their QuickBooks; is that

21     correct?

22 A.  I certainly do now.  And I started with the -- what I

23     consider to be a solid balance sheet from Sheila and income

24     statement at the end of '15.  And I think there was a span of

25     maybe two or three weeks where -- when Sheila retired that

32

1       she gave me access, but I never really used it.

2   Q.  Prior to her retiring, did you have access at any time to

3       QuickBooks, their QuickBooks?

4   A.  No.  No, I didn't need to.

5   Q.  Explain to me then how you prepared the 2015 tax return for

6       Premier Harvest?

7   A.  I simply received a balance sheet and profit and loss from --

8       Sheila sent it to me.  I looked at it and used that as the

9       basis to prepare tax returns.

10  Q.  Did you look -- I don't know if this is the right word, but

11      underneath the balance sheet, underneath the profit and loss

12      to verify the backup for each of those numbers?

13  A.  It wasn't required.  You know, a tax preparer does not need

14      to audit the information that's given to him.  If you think

15      something is weird, if there's a miscoding, and I would do

16      that every once in awhile.  We would discuss coding issues

17      and so forth.  One of the things that I was always interested

18      in was the -- where the out-of-pocket expenses that Dustin

19      would have that were business related.  And I would try to

20      pick them up in addition to what was on the profit and loss.

21  Q.  You also indicated that I think you did do one or more audits

22      of Premier Harvest?

23  A.  No, just one.

24  Q.  Once.  Okay.  Do you know if Premier Harvest utilized the

25      services of any other CPA other than you?

33

1   A.   No.

2   Q.   Did you do any work with Premier Harvest to help them secure

3        financing?

4   A.   Other than what I just described with the tribal council, no.

5   Q.   Did you do any work with Premier Harvest to help them secure

6        capital?

7   A.   No, other than with the tribal council.

8   Q.   Did you understand that was going to be a loan or capital?

9   A.   I thought it was going to be a loan is my understanding.

10  Q.   Do you know the amount of that loan?

11  A.   No.  I think it was going to be for millions of dollars.  I

12       think they were going for something like 4 or 5 million to

13       really get the facility where it needed to be and to move

14       things along, but I don't recall the amount.

15  Q.   When you say it was to get the facility where it needed to

16       be, what is the source of your information for that

17       statement?

18  A.   Dustin.

19  Q.   Did he tell you specifics as to what needed to be done to the

20       facility?

21  A.   No.  I don't -- you know, I -- I am somewhat familiar with

22       canneries and seafood operations.  I was involved with a

23       cannery operation in Valdez and also Anchorage.  And I saw

24       various things, and all I know is they're a nightmare.  You

25       know, and your main maintenance guy is worth his weight in

41

1    A.  Just -- not to this size.  You know, you just give them a

2        ledger, guy comes out and looks at it and gives you a check,

3        less the deductible.  And I don't -- this one was an

4        unusual -- but to the -- not to this extent.

5    Q.  I understand that you have not read the Axis Insurance policy

6        in this case, have you?

7    A.  No.

8    Q.  Have you discussed the coverages available under that policy

9        with Dustin Anderson?

10   A.  No.

11   Q.  Do you have any understanding of what type of coverage was

12       provided through that policy?

13   A.  No.

14   Q.  Are you familiar with the term "actual cash value" as it's

15       used in the context of insurance?

16   A.  You know, no, I'm not.  And you know, I'm just a meat and

17       potatoes CPA.  I try to have no nonsense with what I do.

18       And -- but did I examine in detail the insurance coverage?

19       It wasn't necessary for me to do so.

20                           (Exhibit No. 1 marked

21                             for identification.)

22   Q.  Mr. Price, you have Exhibit 1 in front of you.  Can you

23       identify that if you're able?

24   A.  Yeah, it's a subpoena.  What else?

25   Q.  It's a subpoena for today's deposition, correct?

42

1    A.   Yes.

2    Q.   And you were asked to bring with you documents.  Have you

3         brought with you documents?

4    A.   Yes, they're on your desk.

4  5    Q.   Do you have any other documents that are responsive to the

6         subpoena that you did not bring today?

7    A.   No.  Other than the actual QuickBooks.

8    Q.   What do you mean by that?

9    A.   The source of your general ledger printouts.

10   Q.   So you have those actual QuickBooks somewhere?

11   A.   Yes.

12   Q.   Where?

13   A.   They're on my PC.

14   Q.   And where did you get them to put on your PC?

15   A.   Basically had we found out that QuickBooks was --  their

16        online service was completely gone, went out and bought

17        QuickBooks software and started from scratch, and that's what

18        I have on my PC and that's the source of the financial

19        statements.

20   Q.   So this is -- you actually entered the data on your computer?

21   A.   Yeah.  I sat down, I could not deal -- I had to get this

22        done.  And I -- so I just laid out a -- about a three-week

23        time period where I was Premier Harvest.  If somebody asked

24        me my name, I would say Premier Harvest.

25                              (Exhibit No. 2 marked

43

1        for identification.)

2    A.  So I just sat down and punched it in.

3    Q.  Are you done?

4    A.  Yes.

5    Q.  You have Exhibit 2 in front of you.  This is a Subpoena Duces

6        Tecum for documents that were served on you in December of

7        2017, do you recall that?

8    A.  No.  No, I don't recall seeing this.

9    Q.  Do you recall ever producing documents in response to a

10       subpoena in this case prior to today?

11   A.  No.  No, I don't know.  I don't recall any subpoena other

12       than the one where I'm here today.  But I literally had

13       nothing to provide until I sat down and updated the general

14       ledgers.

15   Q.  You had nothing to provide in late 2017?

16   A.  No.  No, it was -- I think it was in January or so that I met

17       Dustin trying to sum up everything and I found out there

18       was -- there were no books for '16 or '17.

19   Q.  Do you recall preparing a tax return for Premier Harvest for

20       the tax year 2015?

21   A.  Yes.

22   Q.  Do you recall when you prepared that?

23   A.  I prepared that somewhere in June or July of '15.

24   Q.  Do you mean 2016?

25   A.  Excuse me, '16, yes, excuse me.

76

1                              for identification.)

2    Q.  Exhibit 17 is before you.  Can you identify that, please?

3    A.  E-mail from Ellie to me.  Wanted to let you know I'll be out

4        of the office today.  We are available by phone.  We are

5        moving Carly out of our house and into storage since she is

6        spending a lot of her time in Alaska.  Here are the accounts

7        that the expenses are under.  Insurance payout and Adak roof

8        to repair.

9    Q.  There's a code 1685 for insurance payout, correct?

10   A.  Uh-huh.

11   Q.  Is that a "Yes"?

12   A.  Yes.

13   Q.  And the code for Adak roof repair was what?

14   A.  1665.

15   Q.  When you went and did your basically reconstructing of the

16       financial information for Premier Harvest within the last

17       month, do you recall encountering either of these codes?

18   A.  Not necessarily.  I don't -- you see, this is what happened.

19       I had to reconstruct all of the books for '16 and '17 from

20       scratch.  And so which meant I had to classify every item

21       that went in and out of all the bank statements.  I would not

22       have used these codes.  I probably would have just put it all

23       into repairs and maintenance just to move forward.  I did not

24       make an effort to try to separate out insurance payout and

25       Adak roof repair because the damage was just a lot more than

1    Adak roof repair.  It was all kinds of damage and -- as I

2    understand it.

3         But I do recall seeing the payments coming in, and I

4    just coded them against repairs and maintenance, just to move

5    forward, or I would have still been working on these books.

6  Q.  Got it.

7                     (Exhibit No. 18 marked

8                      for identification.)

9  Q.  You have Exhibit 18 in front of you.  Can you identify that?

10  A.  Okay.  Here is your most recent spreadsheet.  This is from

11     Ellie to me.  Here is your most recent spreadsheet.  Here is

12     the most recent spreadsheet.  Everything in yellow is not

13     paid, but we are getting it paid this week.

14  Q.  And this is an e-mail dated October 20th of 2016, correct?

15  A.  Yes.

16  Q.  And as far as you know, this is referring to the same

17     spreadsheet that was requested back in August of 2016,

18     correct?

19  A.  Apparently.

20  Q.  Does it refresh your recollection as to who prepared the

21     spreadsheet?

22  A.  I had nothing to do with preparation of the spreadsheet, as I

23     recall.

24  Q.  Okay.

25  A.  And -- but I had to redo everything in the last two months.

1    So whatever may have been categorized back in '16 was lost

2    and I redid everything.

3                        (Exhibit No. 19 marked

4                          for identification.)

5  Q.  Can you identify Exhibit 19?

6  A.  Let's see, from Lisa to Ellie.  Please take off the grocery

7    tab.  We will use the meals tab.  Please scan all new

8    invoices from DL Anderson so we have all insurance expenses

9    on.  I need to get this to John ASAP.  Also, need to get all

10    the statements scanned in.

11        And then, John, here are a few things -- first, a few

12    things I want to explain.  First all highlighted expenses are

13    in the process of being paid this week, so we want them on

14    here as paid.  We have groceries and meals.  We need to use

15    the meals category or groceries but not both.  Ellie is

16    working on getting all receipts together.

17        Yeah.  More about the insurance claim expense

18    spreadsheet.

19  Q.  So is it -- does this refresh your recollection that at least

20    as of October 20th, 2016, the spreadsheets still had not been

21    provided to the insurance company?

22  A.  It looks like it.  But I -- I would say this, if you wanted

23    me to provide an insurance claim expense spreadsheet now, I

24    would merely go to the general ledger, make sure, review my

25    classifications of expenditures, and I could tell you what

1       they had spent versus what they received and -- plus or

2       minus.  That would be -- that's where I would go.  I -- by an

3       old insurance explained spreadsheet, this happened two years

4       ago, and I -- I can't refer to that without review.  I don't

5       know, maybe I have something on my computer that might show

6       some old spreadsheet, but I don't recall doing anything other

7       than making -- getting them to send out the information to

8       you -- to the insurance company as soon as possible.

9   Q.  The e-mail at the top of the first page indicates that Lisa

10      told -- it looks like Ellie -- please scan in all new

11      invoices from DL Anderson, so we have all insurance expenses

12      on; do you see that?

13  A.  Yeah.

14  Q.  Did you ever audit those DL Anderson invoices to determine

15      whether they were doing work related to damage caused by the

16      storm versus other work?

17  A.  No.

18  Q.  When you did your coding, your reconstruction of the books

19      the last month, did you audit the invoices that you

20      identified as repair and maintenance to determine whether it

21      was related to repair versus --

22  A.  No.

23  Q.  -- storm repair versus repair of anything else or maintenance

24      of anything else?

25  A.  No. I suppose if you had questions about the DL Anderson, you

80

1    would have to review to the detail of their bills, and you

2    have probably done that.

3  Q.  If you turn to the next page of the exhibit, I'll tell you

4      that this is not related because you can see from the date

5      that it's not -- I'm not sure why these got stuck together as

6      an exhibit, but I do have a question about this particular

7      e-mail.  This is an e-mail from Dustin Anderson to Lisa

8      Anderson dated October 27, 2017.  Do you see that?

9  A.  Yeah.

10 Q.  It says, John Price called.  He had a conversation with Amy,

11     insurance, and they need further documentation.  Amy needs

12     receipts for all of the items purchased and note to support

13     what it was for.  Do you see that?

14 A.  Uh-huh.

15 Q.  Do you recall that being an issue that you discussed with

16     Amy?

17 A.  Yes.  Actually, I do.  She was the insurance lady, I believe.

18 Q.  And did you think it reasonable that she needed the receipts

19     for the items purchased and noted on the spreadsheet?

20                  MR. TILDEN:  Object to form.  Go ahead.

21 A.  Do I think it was reasonable?  Only to a certain extent.  The

22     thing that irritated me is that she didn't acknowledge

23     receipt of anything.  And I said, Lisa, have you sent in --

24     she said, yes.  So it looked to me like she was dismissive of

25     everything that was sent.

1                               CERTIFICATE

2       STATE OF WASHINGTON )
                            )
3       County of Snohomish )

4

5              I, the undersigned Washington Certified Court
        Reporter, pursuant to RCW 5.28.010 authorized to administer
        oaths and affirmations in and for the State of Washington do
6       hereby certify:

7              That the foregoing deposition of JOHN PRICE was
        taken before me and completed on August 15, 2018, and
8       thereafter was transcribed under my direction; that the
        deposition is a full, true and complete transcript of the
9       testimony of said witness, including all questions, answers,
        objections, motions and exceptions;

10

11             That the witness, before examination, was by me
        duly sworn to testify the truth, the whole truth, and nothing
        but the truth, and that the witness waived the right of
12      signature;

13             That I am not a relative, employee, attorney or
        counsel of any party to this action or relative or employee
14      of any such attorney or counsel and that I am not financially
        interested in the said action or the outcome thereof;

15

16             That I am herewith securely sealing the said
        deposition and promptly delivering the same to Attorney
        WILLIAM F. KNOWLES.

17

18             IN WITNESS WHEREOF, I have hereunto set my hand
        this 24th day of August 2018.

19

20                     _Kim Scheuerman_

21                     Kim Scheuerman, CCR
                       WA CCR. No. 2517
22                     Washington State Certified Court Reporter
                       Residing at Edmonds, Washington.

23

24

25



```
 1   Date:  August 24, 2018

 2

 3

 4   To:    WILLIAM F. KNOWLES
            COZEN O'CONNOR
 5          999 Third Avenue, Suite 1900
            Seattle, Washington 98104
 6
     Case:  PREMIER HARVEST, LLC., et.al., v AXIS SURPLUS
 7   INSURANCE COMPANY and CUNNINGHAM LINDSEY U.S., INC.,
     Cause No.:  2:17-cv-00784-JCC
 8

 9

10

11   YOU ARE HEREBY NOTIFIED that the following original
     transcript has been sealed and served upon you for filing:
12
     Deposition of:  JOHN PRICE
13
     Taken:  August 15, 2018
14
     Signature:      Waived    _XXX____
15
                     Reserved  _____
16
                     Within 30 days or before the trial date,
17                   the witness should forward to you the
                     original signed correction sheet, which can
18                   be filed separately at the time of trial.

19                   Do not open the sealed transcript.

20

21

22

23

24

25   cc:  JEFFREY I. TILDEN, VASUDEV N. ADDANKI
```



**EXHIBIT H**

**to**

**Declaration of Craig H. Bennion**

**From:** John Price [JACOB2545@msn.com]
**Sent:** Thursday, September 29, 2016 4:34 PM
**To:** ellie@premierharvest.net
**Subject:** Re: Insurance spreadsheet

I will look for it

> On Sep 29, 2016, at 5:52 PM, "ellie@premierharvest.net" <ellie@premierharvest.net> wrote:
>
> Hello John,
>
> Lisa wanted me to let you know she is going to send you an insurance spreadsheet with all of the expenses.
>
> Thank you,
>
> Ellie Garcia



EXHIBIT
16

# EXHIBIT I

## to

# Declaration of Craig H. Bennion

**From:** ellie@premierharvest.net
**Sent:** Thursday, October 20, 2016 12:15 PM
**To:** John Price
**Subject:**
**Attachment(s):** "Expenses for Insurance claim.xlsx"

Hello John,

Here is the most recent spreadsheet. Everything in yellow is not paid but we are getting it paid this week.

Thank you,

Elizabeth Garcia



PH_00043785