The Honorable John Coughenour

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT SEATTLE

| | |
|---|---|
| PREMIER HARVEST LLC, a Washington Limited Liability Company; PREMIER HARVEST LLC, an Alaska Limited Liability Company; PREMIER HARVEST ADAK LLC, an Alaska Limited Liability Company, <br><br> Plaintiffs, <br><br> v. <br><br> AXIS SURPLUS INSURANCE COMPANY, a Foreign Corporation; CUNNINGHAM LINDSEY U.S., INC., a Foreign Corporation, <br><br> Defendants. | NO. 2:17-cv-00784-JCC <br><br> PLAINTIFF'S RESPONSE TO DEFENDANT AXIS SURPLUS INSURANCE COMPANY'S MOTION FOR SANCTIONS FOR SPOLIATION OF EVIDENCE |

## I. INTRODUCTION

AXIS Surplus Insurance Company's (AXIS's) motion for sanctions misstates the evidence and ignores the governing law. It should be denied.

PLAINTIFF'S RESPONSE TO DEFENDANT AXIS'S MOTION FOR SANCTIONS FOR SPOLIATION OF EVIDENCE - 1
No. 2:17-cv-00784-JCC

GORDON TILDEN THOMAS CORDELL
600 University Street
Suite 2915
Seattle, WA 98101
206.467.6477

## II. FACTUAL BACKGROUND

**A. Premier Harvest's Underlying Documents**

**1. Invoices, Checks, Bank Statements All Present and Accounted For**

In 2015 and early 2016, Premier Harvest was an operating business. It received invoices and it paid bills. With respect to these:

- No invoice is alleged to have been destroyed.
- No check is alleged to have been destroyed.
- AXIS has obtained copies of all of our invoices and checks.
- AXIS has subpoenaed our banks.

Declaration of William Marx at ¶ 2. No underlying documents of any kind are alleged to be missing.

**2. QuickBooks**

Premier Harvest kept a general ledger, analogous to a checkbook, using QuickBooks software and stored in the cloud by a vendor named Right Networks.[1] Once an expense was incurred, most of the data input was performed by the bookkeeper. In 2016, this was generally Ellie Garcia. Declaration of John Price at ¶ 2. The software employs a "Repairs and Maintenance" code which could be assigned to a given expense. Id. at ¶ 3. It contained no code that ever segregated repairs between storm damage and other work, even if the person inputting the expense was aware of the nature of the expense. Id. The vast majority of expenses were coded Repairs and Maintenance. Id.

---

[1] Dustin Anderson Dep. at 27; W. Marx Decl. at ¶ 3. The deposition excerpts of Dustin Anderson and John Price, CPA are Exhibits A and B to the Declaration of Jeffrey I. Tilden.

PLAINTIFF'S RESPONSE TO DEFENDANT AXIS'S MOTION FOR SANCTIONS FOR SPOLIATION OF EVIDENCE - 2
No. 2:17-cv-00784-JCC

GORDON TILDEN THOMAS CORDELL
600 University Street
Suite 2915
Seattle, WA 98101
206.467.6477

### 3. Disappearance of QuickBooks Data

In 2016, the Premier Harvest business failed—we allege due to AXIS's actions—and the Andersons got divorced, a related event. In the process, the data storage monthly fee was not paid. The Andersons were in the middle of a divorce. Late notices about payment were not received. Mr. Anderson was not aware of the notices. Dustin Anderson Dep. at 27.

In early 2018, Dustin Anderson and John Price, the CPA who does the accounting for Premier Harvest and the Andersons, contacted Right Networks in an effort to obtain the general ledger data. Both Mr. Anderson and Mr. Price assumed Right Networks would have it stored in the cloud. They learned then that the data had been destroyed.[2] Mr. Price was "amazed." Price Dep. at 12, 31.

### 4. Re-Creation of General Ledger

Unrelated to this lawsuit, Premier Harvest had to re-create the QuickBooks general ledger in order to prepare P&L statements for the years 2016 and 2017, file federal income tax returns, and close out the Premier Harvest business. Price Decl. at ¶ 3. Mr. Price did this in July and August of 2018. He used the same invoices, checks, and codes that Ms. Garcia previously used. Id. AXIS has them. While Mr. Price may have coded a given expense differently than Ms. Garcia (e.g., "Supplies" vs. "Repairs and Maintenance"), it was still the case that no separation was made between storm-related repairs and others. Id. In both instances, the vast majority of expenses were coded "Repairs and Maintenance." Id. AXIS has this general ledger.

---

[2] AXIS has submitted the Declaration of Collene Vanderburg regarding her discussions with QuickBooks. We assume the declaration is entirely accurate, but Premier Harvest's data was deleted by Right Networks—not QuickBooks—after 90 days, not 12 months. D. Anderson Dep. at 27; Marx Decl. at ¶ 3.

PLAINTIFF'S RESPONSE TO DEFENDANT AXIS'S
MOTION FOR SANCTIONS FOR SPOLIATION OF
EVIDENCE - 3
No. 2:17-cv-00784-JCC

GORDON
TILDEN
THOMAS
CORDELL

600 University Street
Suite 2915
Seattle, WA 98101
206.467.6477

### 5. Summary

In sum, this motion for sanctions: (a) involves QuickBooks data initially prepared by a bookkeeper and re-created by a CPA; (b) from invoices and checks which have not been affected at all; (c) due to a decision by Right Networks to delete data for non-payment of a debt that Premier Harvest did not realize was owing.

### B. Related Insurance Issues That Color This Motion

### 1. Premier Harvest Purchased an ACV Policy

Property policies are of two forms: (a) replacement cost value ("RCV"); or (b) actual cash value ("ACV"). An RCV policy typically pays out more and generally requires the policyholder to actually rebuild property. Thomas V. Harris, Washington Insurance Law § 47.02 (3d ed. 2010). In that context, a review of the Premier Harvest repair costs may well have substantial relevance to the lawsuit.

Premier Harvest, however, did not buy an RCV policy. Both sides agree the policy purchased here was an ACV policy. An ACV policy—similar to first-party collision coverage an auto owner may have—does not require the policyholder to replace. Id. The policyholder can rebuild if s/he likes. Alternatively, they can invest the money, gamble it away in Las Vegas, or put it under their mattress. ACV is determined by calculating RCV and then applying depreciation. Id. This calculation is performed without regard to the policyholder's use of the money. Indeed, the best evidence of this is that AXIS has retained experts to address the issue of ACV, none of whom has relied on Premier Harvest's actions. Nor has ours. What Premier Harvest spent the money on is completely irrelevant to its insurance rights.[3]

---

[3] Indeed, AXIS's focus on this issue and the extensive related delay in adjusting our claim is a focus of our bad faith case.

PLAINTIFF'S RESPONSE TO DEFENDANT AXIS'S
MOTION FOR SANCTIONS FOR SPOLIATION OF
EVIDENCE - 4
No. 2:17-cv-00784-JCC

GORDON
TILDEN
THOMAS
CORDELL

600 University Street
Suite 2915
Seattle, WA 98101
206.467.6477

## 2. AXIS's Duty to Investigate

Under the policy AXIS sold here—and the governing Washington Administrative Code regulations—it is <u>AXIS</u> that has the duty to investigate and determine all elements of the claim, including ACV:

> **Standards for prompt investigation of a claim.**
>
> <u>Every insurer must complete its investigation of a claim within thirty days after notification of claim, unless the investigation cannot reasonably be completed within that time</u>.

WAC 284-30-370 (emphasis supplied). <u>See</u> also WAC 284-30-320(9), 330(3)(4), and 380(3). The notion that AXIS was relying on Premier Harvest to do its work for them for two years completely stands the law on its head and is not a permitted defense. The Court need not address this issue here. We raise it only because the opening brief is replete with misunderstanding on this issue.

## C. Issues That Do Not Matter for Present Purposes

AXIS takes two potshots at Premier Harvest in its briefing that are unrelated to the issue before the Court. We would like to clarify them nonetheless.

### 1. Bankruptcy

AXIS asserts that Premier Harvest was about to file bankruptcy. It is not true. Dustin and Lisa Anderson were "all in" on the Premier Harvest investment. They had sold their home in Bellingham and were totally committed to the Adak facility. Money was tight, but they survived with the aid of financing and product sales. They never considered liquidation (as opposed to reorganization). D. Anderson Dep at 22-23, 120-23. This issue is a red herring.

PLAINTIFF'S RESPONSE TO DEFENDANT AXIS'S
MOTION FOR SANCTIONS FOR SPOLIATION OF
EVIDENCE - 5
No. 2:17-cv-00784-JCC

GORDON
TILDEN
THOMAS
CORDELL

600 University Street
Suite 2915
Seattle, WA 98101
206.467.6477

### 2. $1.5 Million Drop in Equity

AXIS cites a $1.5 million drop in equity on the Premier Harvest balance sheet in 2015 as evidence of a financial calamity pre-dating the Adak weather events. Opening Br. at 2. AXIS does not understand accounting. Premier Harvest spent roughly $1.5 million upgrading the Adak facility prior to the storms. As an accounting matter, it had two theoretical options:

- It could have booked the $1.5 million it spent as an asset—prepaid rent—and written it off as rent was owed over years; or

- It could have expensed the entire amount in the first year, running the $1.5 million through the P&L statement and taking the resulting negative number and applying it to shareholder equity on the balance sheet.

Because there were questions post-storm whether Premier Harvest remained a "going concern," Mr. Price believed the second option was most appropriate. Price Dep. at 25. Given a choice, no business owner would ever do the former if they expected to have any income in the near term. Everyone would do the latter. The Court can take judicial notice of the fact that the business community in America has consistently lobbied for expensing over depreciation and accelerated depreciation over straight-line depreciation. We are confident that both AXIS and its law firm apply these rules in their own business.[4]

### III. THE LAW

The law regarding sanctions and Electronically Stored Information has gone through three stages of evolution: (a) initial common law cases culminating in the Zubulake decisions;[5]

---

[4] The notion that a corporation wants a large amount of assets on its financial statement stands investment wisdom on its head. A primary measure used to judge financial performance is return on equity. The only way to have an attractive ROE is to have high profits relative to equity in the business. A high ROE is best achieved with high profits and low equity. An enormous attraction of internet companies like Google and Facebook is their lack of fixed assets. Warren Buffet has written extensively on this issue. See, e.g., 2007 Berkshire Hathaway Annual Report at pp. 7-9, available at www.berkshirehathaway.com. Lawyers do not keep capital in their law firms they do not require. Law firms can be highly profitable with little or no equity.

[5] See, e.g., Zubulake v. UBS Warburg, 220 F.R.D. 212 (SDNY 2003), commonly called "Zubulake IV."

PLAINTIFF'S RESPONSE TO DEFENDANT AXIS'S
MOTION FOR SANCTIONS FOR SPOLIATION OF
EVIDENCE - 6
No. 2:17-cv-00784-JCC

GORDON TILDEN THOMAS CORDELL | 600 University Street
Suite 2915
Seattle, WA 98101
206.467.6477

(b) the 2006 Amendments to FRCP 37, designed to narrow the scope of sanctionable conduct; and (c) the 2015 Amendments to FRCP 37, designed to substantially further narrow the scope of sanctionable conduct.

The AXIS brief gives no hint it is even aware of FRCP 37, <u>the governing law</u>. AXIS cites 12 cases, 11 adopted before the 2015 amendments to FRCP 37 and four decided before even the 2006 amendments. It makes no mention of the Rule.

**A.     Federal Rule of Civil Procedure 37(e)**

FRCP 37(e) provides:

> (e) FAILURE TO PRESERVE ELECTRONICALLY STORED INFORMATION. If electronically stored information that should have been preserved in the anticipation or conduct of litigation is lost <u>because a party failed to take reasonable steps</u> to preserve it, <u>and it cannot be restored or replaced</u> through additional discovery, the court:
>
> > (1) <u>upon finding prejudice</u> to another party from loss of the information, <u>may order measures no greater than necessary</u> to cure the prejudice; <u>or</u>
> >
> > (2) <u>only upon finding that the party acted with the intent to deprive</u> another party of the information's use in the litigation may:
> >
> > > (A) <u>presume that the lost information was unfavorable</u> to the party;
> > >
> > > (B) <u>instruct the jury</u> that it may or must presume the information was unfavorable to the party; or
> > >
> > > (C) <u>dismiss the action</u> or enter a default judgment.

(emphasis supplied). The amendment was effective December 1, 2015. It was a conscious tightening up of the 2006 Safe Harbor provision which itself had proven inadequate to minimize claims of spoliation. The comments to the 2015 amendment are explicit on this score:

> This limited rule [the 2006 amendment] has not adequately addressed the serious problems resulting from the continued exponential growth and the volume of such [electronically stored] information. …

PLAINTIFF'S RESPONSE TO DEFENDANT AXIS'S
MOTION FOR SANCTIONS FOR SPOLIATION OF
EVIDENCE - 7
No. 2:17-cv-00784-JCC

GORDON TILDEN THOMAS CORDELL
600 University Street
Suite 2915
Seattle, WA 98101
206.467.6477

> New Rule 37(e) replaces the 2006 rule. It authorizes and specifies measures a court may employ if information that should have been preserved is lost, and specifies the findings necessary to justify these measures. <u>It therefore forecloses reliance on inherent authority or state law to determine when certain measures should be used.</u>[6]

Committee Notes (emphasis supplied).

The Committee Notes make several other observations significant here.

- <u>Perfection Is Often Impossible</u>. "Due to the ever-increasing volume of electronically stored information and the multitude of devices that generate such information, <u>perfection in preserving all relevant electronically stored information is often impossible</u>. As under the current rule, the routine, good-faith operation of an electronic information system would be a relevant factor for the courts to consider in evaluating whether a party failed to take reasonable steps to preserve lost information …." <u>Id.</u> (emphasis supplied).

- <u>Sophistication of Parties Relevant</u>. "The court should be <u>sensitive to the parties' sophistication</u> with regard to litigation in evaluating preservation efforts: some litigants, particularly individual litigants, may be less familiar with preservation obligations than others who have considerable experience in litigation." <u>Id.</u> (emphasis supplied).

- <u>Information Not in Parties' Control</u>. "Because the rule calls only for reasonable steps to preserve, it is inapplicable when the loss of information occurs despite the party's reasonable steps to preserve. <u>For example, the information may not be in the party's control</u>." <u>Id.</u> (emphasis supplied).

**B.     Application to Premier Harvest**

**1.     The Information Has Been Restored or Replaced**

Rule 37(e) requires that the Court's first focus be on whether the information can be restored or replaced. Here it can be and has been. AXIS may point out that the data lost was

---

[6] The first sentence of AXIS's Argument, at page 7, provides:

> Spoliation of evidence falls within the court's inherent power to sanction.

As to conduct covered by FRCP 37(e), this is false

PLAINTIFF'S RESPONSE TO DEFENDANT AXIS'S
MOTION FOR SANCTIONS FOR SPOLIATION OF
EVIDENCE - 8
No. 2:17-cv-00784-JCC

GORDON
TILDEN
THOMAS
CORDELL

600 University Street
Suite 2915
Seattle, WA 98101
206.467.6477

generally created by a clerical worker while the data restored was restored by a CPA. This would seem to us to be an upgrade. AXIS asserts at page 7 of its brief:

> [I]t appears that Premier Harvest may have recoded operational expenses as insurance claim expenses in order to artificially claim a higher amount from AXIS.

This is a fiction. There was never a code for "Operational Expenses" or "Insurance Expenses." The relevant code was for "Repairs and Maintenance." That code did not differentiate between storm-related repairs and any other work performed at the facility. Price Decl. at ¶ 2.

A few lines later on page 7, AXIS asserts another falsehood:

> It isn't possible to test or verify the accuracy of the data in the new, "re-created" account because of the information that Premier Harvest allowed to be destroyed.

This, again, is false. The only way to test the information in the initial general ledger—or in the re-created general ledger—is to check it against the invoices and the checking account records. All of these still exist. What AXIS is investigating—although it never says so—is which <u>invoices</u> relate to repairs. No scrutiny of the general ledger—either the one lost or the one Mr. Price re-created—will shed any light on this issue.[7]

### 2. Failure to Take Reasonable Steps to Preserve

Premier Harvest's actions were completely reasonable under the circumstances. It preserved all of the information that was actually within its control and there has been no suggestion otherwise.

AXIS argues at page 9 that Premier Harvest "ignored repeated threats from QuickBooks and allowed the documents to be automatically deleted." Premier Harvest cannot "ignore a

---

[7] For the reasons addressed in our discussion of ACV on p. 4, this inquiry is irrelevant in any event.

PLAINTIFF'S RESPONSE TO DEFENDANT AXIS'S
MOTION FOR SANCTIONS FOR SPOLIATION OF
EVIDENCE - 9
No. 2:17-cv-00784-JCC

GORDON TILDEN THOMAS CORDELL
600 University Street
Suite 2915
Seattle, WA 98101
206.467.6477

threat" of which it was unaware. All of the evidence is we were surprised or amazed the ledger was deleted. Marx Decl. at ¶ 3; Price Dep. at 12, 31; D. Anderson Dep. at 27.

We recognize that, in some attenuated sense, the preservation of the Right Networks data was in Premier Harvest's "control" (had it received and paid its monthly bill). Nonetheless, it is obvious that documents stored in the cloud by a separate business entity—Right Networks—are less "controlled" than those stored in a computer at one's desk. If the QuickBooks general ledger were fully in Premier Harvest's control, we would still have it. The vendor's superior "control" allowed them to delete it.

With respect to the sophistication of the parties, Dustin Anderson is, in his own words, a "crab fish guy." D. Anderson Dep. at 31.

### 3. Remedies

AXIS seeks a number of remedies including the preclusion of evidence and a jury instruction. These are simply not permitted under the current version of FRCP 37(e).

#### a. No Evidence of Prejudice

Both Ms. Garcia and Mr. Price used the identical checks, checking account statements, and invoices. All of the underlying documents still exist. AXIS's descriptions of prejudice at page 7 of its brief are factually inaccurate, as explained above.

#### b. No Intent to Defraud Another Party of the Information's Use

The 2015 Amendments to FRCP 37(e) <u>preclude</u> all of the relief sought by AXIS absent a finding that Premier Harvest "acted with the intent to deprive another party of the information's use in the litigation." There is zero evidence of this. All of the evidence is that Premier Harvest thought the data was still in existence when it went to look for it.

PLAINTIFF'S RESPONSE TO DEFENDANT AXIS'S
MOTION FOR SANCTIONS FOR SPOLIATION OF
EVIDENCE - 10
No. 2:17-cv-00784-JCC

GORDON
TILDEN
THOMAS
CORDELL

600 University Street
Suite 2915
Seattle, WA 98101
206.467.6477

AXIS's only route to the sanctions it seeks is through FRCP 37(e)(2). The comments to the 2015 Amendments make it crystal clear that any other recourse has been precluded:

> Subdivision (e)(2). This subdivision authorizes courts to use specified and very severe measures to address or deter failures to preserve electronically stored information, but only on finding that the party that lost the information acted with the intent to deprive another party of the information's use in the litigation. It is designed to provide a uniform standard in federal court for use of these serious measures when addressing failure to preserve electronically stored information. It rejects cases such as Residential Funding Corp. v. DeGeorge Financial Corp., 306 F.3d 99 (2d Cir. 2002), that authorize the giving of adverse-inference instructions on a finding of negligence or gross negligence.

(emphasis supplied). See generally Regeneron Pharmaceuticals, Inc. v. Merus N.V., 864 F.3d 1343, 1364 n. 7 (Federal Circuit 2017); Waymo LLC v. Uber Technologies, Inc., 2018 WL646701 at *14 (N.D. Cal. 2018).[8]

AXIS's brief ignores the 2015 amendments to the Civil Rules in favor of a large volume of law that is no longer applicable. Even under earlier law, however, we believe the results would be the same. Judge Shira Scheindlin and one of her law clerks canvased sanction decisions in a 2004 article in the Michigan Telecommunications & Technology Law Review. They concluded:

> In short, the results of our survey reveal that the profile of a typical sanctioned party is a defendant that destroys electronic information in violation of a court order, in a manner that is willful or in bad faith, or causes prejudice to the opposing party.

S. Scheindlin & K. Wangkeo, ELECTRONIC DISCOVERY SANCTIONS IN THE 21ST CENTURY, 11 Mich. Telecomm. & Tech. L. Rev. 71, 80 (2004). In no respect does this describe Premier Harvest's conduct here.

---

[8] The Court's inherent authority still exists, in areas not covered by FRCP 37. See, e.g., Goodyear Tire & Rubber Co. v. Haeger, 137 S.Ct. 1178 (2017) (plaintiff did not learn of withheld information until after the lawsuit was settled).

PLAINTIFF'S RESPONSE TO DEFENDANT AXIS'S
MOTION FOR SANCTIONS FOR SPOLIATION OF
EVIDENCE - 11
No. 2:17-cv-00784-JCC

GORDON TILDEN THOMAS CORDELL
600 University Street
Suite 2915
Seattle, WA 98101
206.467.6477

## IV. CONCLUSION

Likely every party to ever oppose a sanctions motion has argued that the moving party was attempting to do something through the discovery process—prevail—that they could not do on the merits. We are no different. The conduct at issue here is not sanctionable under *Zubulake*, the 2006 amendments to the Federal Rules, or current law. AXIS's motion should be denied.

DATED this 10th day of September, 2018.

        **GORDON TILDEN THOMAS & CORDELL LLP**
        Attorneys for Plaintiffs

        By   s/ *Jeffrey I. Tilden*
            Jeffrey I. Tilden, WSBA #12219
            Greg D. Pendleton, WSBA #38361
            600 University Street, Suite 2915
            Seattle, Washington 98101
            206.467.6477
            jtilden@gordontilden.com
            gpendleton@gordontilden.com

        **KELLER ROHRBACK LLP**
        Attorneys for Plaintiffs

        By   s/ *William C. Smart*
            William C. Smart, WSBA #8192
            Isaac Ruiz, WSBA #35237
            Ian S. Birk, WSBA #31431
            1201 Third Avenue, Suite 3200
            Seattle, WA 98101
            206.623.1900
            wsmart@kellerrohrback.com
            iruiz@kellerrohrback.com
            ibirk@kellerrohrback.com

PLAINTIFF'S RESPONSE TO DEFENDANT AXIS'S MOTION FOR SANCTIONS FOR SPOLIATION OF EVIDENCE - 12
No. 2:17-cv-00784-JCC

GORDON TILDEN THOMAS CORDELL | 600 University Street
Suite 2915
Seattle, WA 98101
206.467.6477

# CERTIFICATE OF SERVICE

I hereby certify that on this 10th day of September, 2018, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following:

***Attorneys for Defendant AXIS Surplus Ins. Co.*:**
Thomas M. Jones, WSBA #13141
Craig H. Bennion, WSBA #11646
William F. Knowles, WSBA #17212
Jonathan Toren, WSBA #46896
Cozen O'Connor
999 Third Avenue, Suite 1900
Seattle, WA 98104-4028
tjones@cozen.com
cbennion@cozen.com
wknowles@cozen.com
jtoren@cozen.com

***Attorneys for Defendant Cunningham Lindsey U.S., Inc.*:**
Joseph D. Hampton, WSBA #15297
Vasudev N. Addanki, WSBA #41055
Kathryn N. Boling, WSBA #39776
Betts, Patterson & Mines, P.S.
701 Pike Street, Suite 1400
Seattle, WA 98101-3927
jhampton@bpmlaw.com
vaddanki@bpmlaw.com
kboling@bpmlaw.com

DATED this 10th day of September, 2018, at Seattle, Washington.

    s/ *Greg D. Pendleton*
    Greg D. Pendleton, WSBA #38361

PLAINTIFF'S RESPONSE TO DEFENDANT AXIS'S
MOTION FOR SANCTIONS FOR SPOLIATION OF
EVIDENCE - 13
No. 2:17-cv-00784-JCC

GORDON TILDEN THOMAS CORDELL
600 University Street
Suite 2915
Seattle, WA 98101
206.467.6477